OPINION OF THE COURT
Daniel P. Conviser, J.
The respondent is the subject of a petition for sex offender civil management pursuant to article 10 of the Mental Hygiene Law (the Sex Offender Management and Treatment Act or SOMTA). The instant decision concerns this court’s conclusion following a Frye hearing (see Frye v United States, 293 F 1013 [DC Cir 1923]) about whether the diagnosis proffered by the State here, “Other Specified Paraphilic Disorder (OSPD) hebe-philia,” has gained general acceptance in the relevant scientific community. As outlined infra, hebephilia has been defined in varied inconsistent ways. The most informed researchers who have analyzed the disorder, however, have generally described it as being a preferential or equal (and/or intense and persistent) sexual interest in pubescent children, rather than prepubescent or postpubescent children or adults. They have further defined the disorder by reference to the “Tanner stages” of pubertal development (described infra) as being present in persons with a sexual preference for children in Tanner stages 2 and 3 of the five Tanner stages (with stage 1 being prepuber-tal and 5 being adult). Finally, they have assigned a rough age proxy for such pubertal children as being between the ages of 11-14. A person with a hébephilic sexual orientation would thus be one who is preferentially (or compared to other age preferences equally) and/or intensely and persistently sexually aroused to pubertal children between roughly the ages of 11-14, rather than primarily aroused to prepubertal children or postpubertal teenagers or adults. For the reasons outlined infra, the court holds this diagnosis is not generally accepted in the relevant scientific community under the Frye standard.[1]
Glossary of Common Terms
There are a number of terms used repeatedly in this decision which are useful to outline at the outset.
The New York State Office of Mental Health (OMH) is the agency responsible for evaluating sex offenders for possible *498 SOMTA proceedings and operating secure mental health facilities at which offenders under the law are housed and treated.
In order to be subject to SOMTA, offenders must be found to have a mental abnormality. That is defined as "a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i].)
The term SVP or SVP programs (SVP being an abbreviation for “sexually violent predator”) is used here as a shorthand to denote sex offender civil management programs like SOMTA. Twenty states and the federal government have sex offender civil management laws. All except New York and Texas require confinement for offenders. New York provides for either confinement or Strict and Intensive Supervision and Treatment in the Community. Texas requires only community supervision.
The penile plethysmograph or PPG is a test which measures physical male sexual arousal in response to visual or aural stimuli through a device which measures blood flow to the penis.
The Tanner development stages is a scale which describes, verbally and through drawings, five stages of physical sexual development ranging from prepubescence to adulthood. It provides separate descriptions and drawings of each stage of sexual development with respect to pubic hair, breast development and penis development. It includes 15 descriptions (five each for pubic hair, breast and penis development) and 20 corresponding drawings (five for male pubic hair, five for female pubic hair, five for breast development and five for penis development).
Tanner stage 1 is prepubertal and has also been described as “preadolescent.” Tanner stages 2 and 3 are pubertal. Tanner stages 4 and 5 are postpubertal. Tanner stage 5 has also been described as “mature” or “adult.” A child in Tanner stage 1 has no secondary sexual characteristic development (Wilson tr at 492).[2]
*499 I. The Respondent’s Criminal History and Diagnoses[3]
Dr. Lord, the State’s evaluator whose diagnosis is directly at issue here, originally diagnosed the respondent with the condition, “Other Specified Paraphilic Disorder, sexually inexperienced young teenage males,” and opined Mr. P. had a mental abnormality under article 10. His current diagnosis, as noted, supra, is OSPD hebephilia. In his report outlining his original diagnosis, Dr. Lord described Mr. P.’s erotic focus as being to “young, sexually inexperienced males,” “very young teen-aged boys,” “underage males,” “underage boys” and “young boys.” He noted confirmed or possible sexual offending against boys aged 14 and 15 and said Mr. P. had worked as a schoolteacher with 12 and 13 year olds.[4]
Mr. P. is currently 72 years old. He says he has both a law and psychology degree. In 2001, at the age of 57, he was charged in a 209-count indictment with forcible sodomy, disseminating indecent materials to minors and the possession of child pornography, the latter charge constituting the vast majority of the counts. He pleaded guilty to one count of sodomy in the first degree by forcible compulsion and two counts of disseminating indecent materials to minors in full satisfaction of the charges. The presentence investigation and report for this crime (the PSI) recounts that the defendant forced a 14-year-old boy to perform oral sex upon him, shared pornography with the boy and tried to maintain contact with him after the assault. The respondent was also alleged to have had sexually explicit conversations and shared pornography with two additional underage male victims who according to the PSI were either 14 or 15 at the time of the crimes.
The PSI indicates that Mr. P. had previously reported becoming sexually involved with a 14-year-old boy when he was working as a teacher and that he had engaged in sexual activity with a Boy Scout when he was working as a Boy Scout troop leader. Mr. P. has no criminal history relevant to these two additional alleged incidents. In his sex offender treatment *500 homework while attending the sex offender treatment program at Gowanda Correctional Facility in 2003 and 2004, Mr. P. described the victim of the instant offense as “slightly built, somewhat short for his age, shy and diffident.”[5] Dr. Lord opined that these features further distinguished this victim from age-appropriate sexual partners. Mr. P. was released from prison to parole on May 27, 2005. He then absconded to Colombia where he was convicted of a child pornography crime and incarcerated. He was subsequently returned to the United States after serving his Colombian prison sentence.
In its decision finding probable cause to believe Mr. P. was a sex offender requiring civil management, this court reported that Dr. Lord “said that Mr. P. had a deviant sexual interest in males who were approximately 14 years old. Dr. Lord acknowledged that boys of this age were often post-pubescent.”[6] The court also said that
“Dr. Lord acknowledged that hebephilia is a controversial diagnosis in the psychiatric community, that he had not previously assigned the ‘sexually inexperienced young teen aged male’ paraphilia diagnosis and that he was not aware of any research which supported it. He felt that this diagnosis, because it was a more carefully defined subset of hebephilia, was a less problematic diagnosis than hebephilia alone. He also opined the diagnosis was accepted in the psychiatric community because he had arrived at it pursuant to the procedures in the DSM [the Diagnostic and Statistical Manual of Mental Disorders, discussed infra].’”[7]
The State also retained a second expert examiner in this case, Dr. John Thomassen. He opined that Mr. P. had OSPD hebephilia and a mental abnormality under article 10. Dr. Thomassen said:
“[h]ebephilia is a condition of sexual arousal to underage children with secondary sexual characteristics, from age 13 or 14 to 16 years old. This examiner only applies this diagnosis if the same criteria are met for Pedophilic Disorder, except for *501 the victim age range of 14 to 16 years old, instead of 13 or younger.”[8]
The respondent’s expert, Dr. Leonard Bard, opined that Mr. P. did not have a paraphiliá or a mental abnormality. Regarding Dr. Lord’s diagnosis of OSPD, “sexually inexperienced young teenaged males,” Dr. Bard opined that “[t]his ‘diagnosis’ was created by Dr. Lord specifically for Mr. P. as there is no such diagnosis in the DSM-5 nor have I see this specific diagnosis in my thirty years of conducting sex offender evaluations.”[9]
II. Evidence Presented at the Hearing
Six expert psychiatrists or psychologists testified at the hearing, three for each party. Drs. Christopher Kunkle, David Thornton and Robin Wilson testified for the State. Drs. Karen Franklin, Charles Ewing and Cynthia Calkins testified for the respondent. The court also received 138 scholarly articles, opinion pieces and book chapters or excerpts into evidence. The testimony and what the court found were the most relevant articles are outlined below. All of the witnesses and a number of the articles discussed the DSM and the proposal which was made but ultimately rejected for a new diagnosis of “pedohebe-philia” in the most recent edition of the manual, the DSM-5, which was published in 2013. The DSM’s provisions and history are also integral to this court’s conclusions. The DSM and the pedohebephilia proposal are thus first outlined here.
The DSM-5 and its Prior Editions
The DSM was first published in 1952 and has gone through multiple numerical iterations.[10] The edition immediately preceding the DSM-5 was the DSM-4-TR (Text Revision) which was published in 2000. Multiple witnesses described the DSM-5 as representing a “consensus” among American psychiatry of those conditions the profession had decided to define as illnesses and said the manual was generally accepted in the psychiatric community. (Ewing tr at 748; Thornton tr at 575; Wilson tr at 464, 469.) The DSM-5 classifies eight named para-philic disorders (not including the condition at issue here). It defines the word “paraphilia” as
“any intense and persistent sexual interest other than sexual interest in genital stimulation or preparatory fondling with phenotypically normal, *502 physically mature, consenting human partners.[11] In some circumstances, the criteria ‘intense and persistent’ may be difficult to apply, such as in the assessment of persons who are very old or medically ill and who may not have ‘intense’ sexual interests of any kind. In such circumstances, the term paraphilia may be defined as any sexual interest greater than or equal to normophilic sexual interests. There are also specific paraphilias that are generally better described as preferential sexual interests than as intense sexual interests” (DSM-5 at 685).[12]
One may have a paraphilia, however, without having a para-philic disorder. A paraphilia describes a sexual interest and is a “necessary but not a sufficient” predicate for a paraphilic disorder (DSM-5 at 686). A paraphilic disorder “is a paraphilia that is currently causing distress or impairment to the individual or a paraphilia whose satisfaction has entailed personal harm, or risk of harm, to others” (DSM-5 at 685-686). The eight listed paraphilic disorders are: voyeuristic disorder, exhibitionistic disorder, frotteuristic disorder, sexual masochism disorder, sexual sadism disorder, pedophilic disorder, fetishistic disorder and transvestic disorder.
The DSM-5 also includes the diagnosis OSPD, which, with the specifier “hebephilia,” is at issue here. The OSPD provision reads in relevant part:
“This category applies to presentations in which symptoms characteristic of a paraphilic disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the para-philic disorders diagnostic class. The other specified paraphilic disorder category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific paraphilic disorder. *503 This is done by recording ‘other specified paraphilic disorder’ followed by the specific reason (e.g., ‘zoophilia’)” (DSM-5 at 705).[13]
This passage goes on to provide six non-exclusive examples of OSPD diagnoses: the sexual attraction to obscene phone calls, corpses, animals, feces, enemas and urine. The DSM-5 also includes the diagnosis “Unspecified Paraphilic Disorder” (UPD), which is not at issue here. These are paraphilias where a clinician chooses not to specify the reason the criteria for one of the eight listed paraphilias have not been met, including presentations for which there is insufficient information.
According to the manual, the eight listed disorders were chosen because “they are relatively common, in relation to other paraphilic disorders,” and because some are classified as crimes (DSM-5 at 685). The manual notes that this list is not exhaustive and that “[m]any dozens of distinct paraphilias have been identified and named” (id.). Dr. Thornton testified that over 500 paraphilias have been identified.[14] The diagnoses of OSPD and UPD, according to the manual, “are therefore indispensable and will be required in many cases” (DSM-5 at 685). The DSM-5 also includes a section entitled “Conditions for Further Study” described as “conditions on which future research is encouraged” (DSM-5 at 783). The distinction between conditions for which detailed criteria are provided and the general OSPD and UPD categories is not limited to para-philic disorders but applies similarly to all disorders in the DSM-5. Thus, disorders for which specific criteria are not provided by the DSM are covered by the formulations “other specified disorder” and “unspecified disorder.” The DSM gives as an example of the former “other specified depressive disorder, depressive episode with insufficient symptoms” (DSM-5 at 15).
The DSM-4-TR categorized paraphilias differently. Conditions were not broken into “paraphilias” and “paraphilic disorders.” Nor did the DSM-4-TR have two categories: OSPD and UPD. Rather, a single category of disorder called “para-philia” existed. The OSPD and UPD category equivalent in the DSM-4-TR was “Paraphilia Not Otherwise Specified” (para-philia NOS). The eight listed paraphilic disorders in the DSM-5 *504 are comparable to the eight paraphilias in the DSM-4-TR and its immediately preceding edition the DSM-4.
The DSM-5 defines “pedophilic disorder,” in part, as “recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger)” (DSM-5 at 697). The DSM-4-TR defined the disorder in similar terms, including the proviso that a sexual interest had to be demonstrated to a prepubescent child and that such children were “generally age 13 years or younger.”
The Proposal for “Pedohebephilia” in the DSM-5
As noted supra, a newly named diagnosis of “pedohebephilia” was proposed for inclusion in the DSM-5 but was ultimately rejected. Three bodies had to approve a new paraphilia diagnosis before it could be added to the DSM-5. The first was the “sub-work group” on paraphilic disorders chaired by Dr. Raymond Blanchard. Next, the disorder had to be approved by the “work group” on sexual and gender identity disorders, chaired by Dr. Kenneth Zucker. Finally, it had to be approved by the Board of Trustees of the American Psychiatric Association (the APA). “[A]n extensive apparatus for vetting the proposals [for all changes recommended for the DSM-5] was [also] put into place” during the DSM-5 development process consisting of various “committees,” “assemblies” and “groups.”[15]
The pedohebephilia proposal was approved by the sub-work group. The proposal was also approved by the work group (Wilson tr at 554). The disorder was rejected by a vote of the APA Board. The diagnosis included three subtypes: pedophilia, pedohebephilia and hebephilia. The hebephilia subtype under the proposal corresponds to the hebephilia diagnosis at issue here (Wilson tr at 852). It defined the target preference for persons with hebephilia as between the ages of 11-14 (Ewing tr at 767) and also defined the disorder by Tanner stages (Thornton tr at 665). The pedohebephilia proposal defined the target group as children “usually of prepubertal or early pubertal age” (Appelbaum article at 138). Persons with a preference for children aged 10 or less would have the pedophilia subtype while persons with a sexual preference for both prepubescent and pubescent children would have the pedohebephilia subtype.
*505 The actual text of the proposal, however, as recounted in one article received in evidence did not contain those specific criteria.[16] The text of the actual proposal (as recounted in the article) was rather as follows:
“A. Over a period of at least 6 months, one or both of the following, as manifested by fantasies, urges or behaviors:
“(1) recurrent and intense sexual arousal from prepubescent or pubescent children;
“(2) equal or greater arousal from such children than from physically mature individuals.
“B. One or more of the following signs or symptoms:
“(1) the person is distressed or impaired by sexual attraction to children;
“(2) the person has sought sexual stimulation, on separate occasions, from either of the following:
“(a) two or more different children, if both are prepubescent;
“(b) three or more different children, if one or more are pubescent.
“(3) use of child pornography in preference to adult pornography, for a period of six months or longer.
“C. The person is at least age eighteen years and at least five years older than the children in Criterion A.” (See also Hebephilia is Not a Mental Disorder in DSM-4-TR and Should Not Become One in DSM-5 [discussing proposed pedohebephilia criteria].)[17]
Dr. Wilson testified that there is no available information about why the APA Board rejected the pedohebephilia proposal or what the vote of the Board may have been. (Wilson tr at 835-836.) When asked whether there was any public explanation for the decision, he replied: “None whatsoever” (Wilson tr at 548). He said he thought that within the APA Board “there is probably some degree of politics involved in this, in that there is a lot of potential misuse of the DSM within the forensic realm” and “the APA wants to tread lightly, and wants to be sure that they are not sort of unwittingly aiding over-diagnosis” (Wilson tr at 836). On the other hand, Dr. Appelbaum in his article lauded the “openness of the [DSM-5 development] pro *506 cess.”[18] Hebephilia or pedohebephilia are also not included in the DSM-5 as a condition warranting further study or clinical attention. A hebephilia diagnosis has never been included in any DSM edition.
A letter to the editor of a scientific journal by the chair of the sub-work group authored at the time of the publication of the DSM-5 was received in evidence entitled: A Dissenting Opinion on DSM-5 Pedophilic Disorder.[19] The letter noted that members, of the sub-work group signed an agreement prohibiting the disclosure of “confidential information” which the letter defined as including “group discussions, internal correspondence, or any other information about the DSM-5 development process.” It noted that the age of puberty has been falling for many years. It cited studies indicating that “18.3% of white girls, 42.9% of Black non-Hispanic girls, and 30.9% of Hispanic girls had started puberty by the age of 8 years” and that similar results had been obtained with respect to boys who were nine years old.[20]
Dr. Blanchard argued that the notion that a sexual preference for children aged 11-14 is normal does not square with the common understanding of most people or clinicians. He opined with respect to the designation of prepubertal children as being those aged 13 or younger (in the DSM-4-TR and DSM-5) that “the reference to age 13 years is nowadays not so much a realistic guideline to probable age of pubertal onset as it is a backdoor method for permitting the diagnosis of pedophilia in men who actually prefer early pubertal children.”[21] The proposed pedohebephilia disorder was defined as “greater or equal sexual attraction to children age 14 and younger than to physically mature adults.”[22]
Dr. Blanchard asserted the new diagnosis would have served to provide better diagnostic precision rather than resulted in more paraphilia diagnoses and opined that some of the opposition was based on “anticipated (or fantasized) consequences in the courtroom.”[23] He asserted opponents of the diagnosis had fused two issues: the question of whether there are persons who have a sexual preference for pubescent children, which he *507 said was indisputable, and the question of whether such a preference is abnormal or a paraphilia, which can be a subject of honest debate. Opponents of the diagnosis assert that “all-men-are-hebephiles” (because men with a sexual preference for adults will show some arousal to pubescent children of their preferred gender) and make the “Darwinism” argument (that a sexual preference for pubescent children is not abnormal because it promotes reproduction).
Blanchard believes pedophilia and hebephilia are related phenomena and that there is a more pronounced break between pedophiles/hebephiles and persons who are attracted to adults than there is between pedophiles and hebephiles. The “Darwinism” argument does not support the notion that homosexual hebephiles do not have a paraphilia; it would support reinstating homosexuality as a DSM mental disorder.
Dr. Blanchard outlined a number of rationales for the pedo-hebephilia proposal in a blog post which was published in January of 2012 (presumably after the sub-work group’s approval of the proposal but prior to the APA Board vote).[24] Regarding the DSM-4-TR (and later DSM-5) proviso that the pedophilic age preference “was generally age 13 years or younger” he said “the effect of this guideline has simply been to allow clinicians to diagnose hebephilia as pedophilia rather than Paraphilia NOS. That is a convenience purchased at the price of accuracy and transparency.”[25] He described the decision about whether a disorder should be included as a named condition in the DSM-5 as a “binary” one in that “[conditions are in or out.”[26] He asserted (writing prior to the decision about whether the diagnosis would be adopted) that if the disorder was rejected, “that is not the same thing as taking no position.” It would rather be an assertion that men who find pubescent children more arousing than adults “do not have a psychiatric disorder.”[27] If the disorder was rejected, he advocated changing the “13 years or younger” language noting that “10 years or younger” would be closer to the mark today.
Dr. Paul Appelbaum was a forensic consultant to the “Summit Group,” which reviewed various proposals, and attended a *508 December 2012 meeting of the APA Board. Regarding the pedo-hebephilia proposal he wrote:
“Support for the proposal'was based largely on the work of a single research group, represented in the leadership of the subgroup, which suggested the existence of a substantial group of men with sexual interests in children in the early postpubescent period.[28] Objections to the change came from people concerned that a major change in diagnostic approaches should not be based on the work of a single research group and from others who argued that it would be problematic from an evolutionary perspective to characterize attraction to early pubescent children as a disorder. As they noted, in some parts of the world, marriage of children in this age group is common” (Appelbaum article at 138).
Dr. Appelbaum said that “[t]o this debate were added substantial forensic concerns” (id.). He noted that a more expansive definition of pedophilia would arguably lead to more SVP commitments. This fact “although not a reason in itself to reject the proposal” “lent weight to the calls for caution in making such a change in the face of limited empirical support. In the end, the Board of Trustees voted not to accept the expansion of the diagnosis as proposed.”[29] Dr. Appelbaum in his article also discussed the process for the revision of the general DSM-5 text including the definition of a paraphilia and as distinguished from the criterion sets for individual disorders. He described the general text revision process as “hurried,” lacking extensive review and drafted by work groups and DSM staff through a “less-than-transparent process.”[30]
Testimony of State Witness: Dr. Christopher Kunkle
Dr. Kunkle has been the director and chief psychiatric examiner of the SOMTA program since 2012. He received his Ph.D. in 2007, began working at an OMH psychiatric center which managed SOMTA patients that year and has continued doing such work since then.
He defined “hebephilia” as “an intense or recurrent sexual interest in children generally between the ages of 11 and 14 *509 who have begun pubescence” (Kunkle tr at 31) who were generally in Tanner stages 2 and 3. He said the hebephilia diagnosis was generally accepted in the psychiatric community because a sexual interest in pubescent children is “abnormal in comparison to what is considered normal sexuality” (Kunkle tr at 33). He has encountered sexual offenders who have reported sexual interests in prepubescent and pubescent children. OMH evaluators are specifically trained on the hebephilia diagnosis. To make a diagnosis an evaluator would review victim ages, physical information about victims if available, an offender’s statements concerning his sexual preferences and PPG studies if available. Dr. Kunkle compiled data on the number of offenders given a hebephilia diagnosis by OMH examiners from March 15, 2007, immediately prior to the implementation of article 10, until January 26, 2016.
During that period OMH conducted psychiatric evaluations of 1,226 offenders. Seventy-seven were given a hebephilia specifier and 64 of these 77 offenders were found to have a mental abnormality by OMH. Offenders initially found to have a mental abnormality have subsequently been subject to a full range of dispositions under article 10. The data also looked at the age of victims of any of an offender’s offenses but this data only dates back to 2010. Of 32 cases diagnosed with hebephilia between January 1, 2010 and January 31, 2016, all had a victim aged 14 or younger, 28 had a victim aged 13 or younger, 26 had a victim aged 12 or younger, 14 had a victim aged 11 or younger and 11 had a victim younger than 11.
With respect to offenders diagnosed with hebephilia with multiple victims, Dr. Kunkle testified that although the general age preference for a person with hebephilia is 11-14 “you may have victims who are younger or older than the age range, but what you are looking for diagnostically is that the majority of the evidence is pointing towards a persistent or recurrent sexual interest in victims in that pubescence range” (Kunkle tr at 52). He said “pubescence” is the physical onset of adult sexual development. Tanner stage 4 generally includes children in the 15- or 16-year-old range and an attraction to such children would not, absent other conditions, reflect a paraphilia. Hebephilia has been used as a diagnosis in SVP programs throughout the United States, in a German study of men’s self-reported sexual attractions and through a clinic operated by Drs. Blanchard and Freund in Canada.
“[T]here is a very succinct population of individuals who engage in sex with pubescent children persistently and do so *510 because they have a preference or intense interest in engaging in sex with that population” (Kunkle tr at 59). The condition of hebephilia dates back to the 1950s but has only recently become controversial because of SVP laws. OMH employs the guideline that a diagnosis of hebephilia applies to a persistent sexual interest in pubescent children generally aged 11-14 but does not have uniform diagnostic criteria for the diagnosis other than that.
The leading research on the disorder has been conducted by Drs. Blanchard, Freund and Cantor. Dr. Blanchard is a professor at the University of Toronto and an affiliate of CAMH. He was the main proponent of the pedohebephilia proposal. Dr. Kunkle agreed that people progress through puberty at different ages. PPG studies have indicated that men who are attracted to adults also show some response to pubescent or prepubescent children but that is different than saying such men have a specific sexual interest in such children. OMH evaluators typically do not meet victims. In a lot of cases there is little information available to an OMH evaluator about the pubertal state of a victim at the time of an offense. Age is correlated with pubertal development but not directly indicative. African-Americans tend to enter puberty earlier than children of other races.
A person with exclusively 12-year-old victims might receive a diagnosis of hebephilia or pedophilia, depending on other information. In most initial OMH evaluations no PPG data is available. Dr. Blanchard’s 2009 criteria for hebephilia are generally accepted in the psychological community. Of the 77 offenders diagnosed with hebephilia by OMH, Dr. Kunkle is aware of only one in which victim Tanner stage information was available. He said the hebephilia diagnosis is generally accepted among evaluators who work for state agencies and is both accepted and not accepted by evaluators employed by SVP respondents. He said that writings in Germany and Canada indicated the diagnosis was generally accepted among persons who work with sexual disorders who do not necessarily work in forensic settings. Hebephilia was not defined as a specified paraphilia in the DSM-5 for “political” reasons because there was a “stir of controversy” not to legitimize its use in SVP cases (Kunkle tr at 100-101).
Testimony of State Witness: Dr. David Thornton
Dr. Thornton is the research director of the “Sand Ridge Center” which treats offenders under the Wisconsin SVP *511 program. He received a psychiatry degree in the United Kingdom but is not licensed to practice psychiatry in the United States. He previously worked extensively in the British prison system doing policy based research and developing programs, including sex offender treatment programs. He began working at the Wisconsin SVP program in 2001 as its treatment director and in 2013 became the director of the system’s research unit. Dr. Thornton worked as an “expert advisor” to the sub-work group.
The “ICD-10” (International Statistical Classification of Diseases and Related Health Problems) is published by the World Health Organization and is the equivalent to the DSM-5 in countries outside the United States. He said the ICD-10 was generally accepted in the psychiatric community since it was used as an authoritative source outside the United States. The sub-work group were “eminent people who have a substantial clinical and research background” in sexual disorders (Thornton tr at 578). Dr. Blanchard was associated with the Kurt Freund Laboratory, the best PPG laboratory in the world. The APA Board does not have the degree of specialization in sexual disorders that the sub-work and work group had. The general “OSPD” category under the DSM-5 is generally accepted in the psychiatric community. He described Tanner stages 4 and 5 as full adult development. The DSM-5 paraphilia definition referenced, supra, includes both “intense and persistent” interests in other than normophilic sexual behavior and sexual interests which are not intense and persistent but preferential. Under this definition, a sexual preference for a physically immature human being would be a paraphilic interest. Hebe-philia means Tanner stages 2 and 3 but a physically immature person would also include a person in Tanner stage 4.
To examine sexual preferences, a researcher can look at sexual partners, fantasies, self-reports and PPG tests. The more you try to describe sexual age preferences with respect to targets who are close to physical maturity the more there is a potential for error. The DSM-5 describes a pedophilic interest as being to a prepubescent child but also says these are generally children age 13 or younger. Pubescent children, however, in Tanner stages 2 or 3 are generally 11, 12 or 13, so some offenders have been misdiagnosed with pedophilia although they are attracted to pubescent rather than prepubescent children. The ICD-10 includes early pubertal children in Tanner stage 2, so the DSM-5 and the ICD-10 define pedophilia inconsistently.
*512 The significance of the ICD-10 is that it is used by diagnosticians around the world who are not necessarily interested in SVP programs and includes early pubertal children within the target preference for pedophiles. The ICD-10 defines “pedophilia” as “[a] sexual preference for children, boys or girls or both, usually of prepubertal or early pubertal age.”[31] This “partially encompasses” the definition of hebephilia. Dr. Thornton described “pedophilia” as a sexual interest in prepubescent children in Tanner stage 1 and “hebephilia” as a sexual interest in children in Tanner stages 2 and 3. Age ranges can be used as a proxy for these determinations but children progress through developmental stages at different rates. If an age proxy is used, prepubescence is generally ages up to 11 while pubertal children in Tanner stages 2 and 3 are generally aged 11-14. On the other hand, there have been cases of children aged seven or eight in Tanner stages 2 or 3. The “early pubertal age” criteria in the ICD-10 could correspond to either Tanner stage 2 or stages 2 and 3.
The PPG is a useful way to determine a subject’s “erotic age preference” (sometimes referred to here with the shorthand “preference”) since in the real world sexual stimuli present in complex ways which make such analysis difficult. PPG studies have shown that some men have a preference for very young kids, some for pubertal kids and some for adults. A Blanchard study found that some men both self-reported a preference for pubertal children and responded most positively to PPG tests involving subjects in Tanner stages 2 and 3. Similar results arose in a German study (the Veratal study) under the Dun-kelfeld project where men with erotic preferences for children who had not been involved with the criminal justice system were asked to come forward and be assessed and treated. This project found a significant number of men had a sexual interest in Tanner stages 2 and 3 which the German study identified as hebephilia.
Dr. Thornton presented an article entitled Sexual Attraction to Others: A Comparison of Two Models of Alloerotic Responding in Men.[32] This PPG study attempted to distinguish both age and gender preferences among subjects. A graph from the article demonstrated that a man with a sexual preference for adult women would have, in descending order, a sexual prefer *513 ence for adult women, pubescent girls, prepubescent girls, prepubescent boys, pubescent boys and adult men. Adults with a heterosexual orientation and a hebephilic preference were shown to have their peak sexual arousal to pubescent girls with roughly equal arousal to adult women and prepubescent girls, although the sexual preference for adults was somewhat greater. Men with a homosexual hebephilic orientation had similar PPG results, again demonstrating the greatest arousal to pubertal boys.
Dr. Thornton conducted a study in connection with the DSM-5 pedohebephilia proposal, at the Wisconsin SVP program and presented the results with respect to the hebephilia subtype of offenders in the study. Sixty-four offenders were rated by two evaluators on whether they had the hebephilia subtype with respect to written criteria for the proposed DSM-5 diagnosis. There was 77% agreement on the presence or absence of hebephilia between raters (or a Kappa coefficient of .54) which Dr. Thornton described as a “moderate” degree of inter-rater reliability.[33] He said there was a very small amount of “net-widening” apparent in the study since only one offender was diagnosed with hebephilia who would not have been diagnosed with pedophilia under the DSM-4. The DSM-4 tended to diagnose people with 12- or 13-year-old victims in an over inclusive manner. In fact, since the diagnostic criteria for pedohebephilia had been tightened from the definition of pedophilia, there were fewer people diagnosed in the study with pedohebephilia than had been diagnosed with pedophilia.
About 14% of 366 offenders housed at the Wisconsin SVP center were diagnosed with hebephilia. This is one indication the diagnosis is generally accepted. A PPG analysis of offenders at the center found that of 21 offenders diagnosed with he-bephilia, four had a preference for adults and 17 had a preference for physically immature children. These offenders were originally classified based on behavioral history but this analysis showed that the objective data matched that history.
Prior to the APA’s rejection of the pedohebephilia proposal, there was significant concern expressed to the APA that the proposal would result in “net-widening.” Dr. Thornton believes *514 based on his research that the net-widening concern was much less significant than it appeared and that the pedohebephilia proposal would lead to more accurate diagnoses. Now, Dr. Thornton explained, offenders may be diagnosed with OSPD hebephilia but there are no defined criteria for the disorder. Were a new pedohebephilia diagnosis created with defined criteria, this might lead to more accurate diagnoses and fewer offenders diagnosed with the disorder.
Dr. Thornton believes the hebephilia subtype was appropriate for inclusion in the DSM-5 because “it had been established that [a] hebephilic sexual interest pattern existed, and it could be diagnosed with sufficient reliability, and that it wouldn’t lead to great net widening” (Thornton tr at 628). Dr. Thornton believes hebephilia is a paraphilia. There is no serious dispute that there is an erotic age preference continuum. A sexual interest in pubertal children can be distinguished from a sexual interest in prepubescent children or postpubescent adolescents. Dr. Thornton is not aware that a hebephilia proposal was made prior to the DSM-5 proposal. Three professional communities should be assessed to ascertain general acceptance of the diagnosis: forensic evaluators who work with sex offenders, treating professionals and paraphilia researchers. Mental health professionals who are not involved in evaluating, treating or researching sexual disorders would likely not be very informed about these issues.
Mental health professionals employed by the State working with sex offenders pretty uniformly accept the hebephilia diagnosis. It is not uniformly accepted by professionals who work with respondents in SVP proceedings. Apart from persons who are employed on one side or the other in legal proceedings, mental health professionals who work with sex offenders generally “recognize what we are here calling hebephilia sexual interests” but may not assign the hebephilia diagnosis because diagnosis may not be their focus (Thornton tr at 635).
“The people whose business is to assess and the treatment of sex offenders generally accept this [hebephilia]” (Thornton tr at 637).[34] The DSM-5 provides the OSPD designation and “defined paraphilias in a way which included physical maturity and responses to physically mature bodies” (Thornton tr at 637). The sub-work group wrote the preface to the paraphilia sec *515 tion, or at least the first draft of that section, where normo-philic sexual arousal is defined as being, inter alia, to adult human bodies. As manifested in that definition, there was a “conscious and deliberate effort” by the drafters of the DSM-5 to allow the hebephilia diagnosis (Thornton tr at 646).
The controversy over the diagnosis arises from a dislike for civil commitment laws, which are opposed by the APA; the concern over net-widening; and the view that these “diagnostic options are being created as some kind of conspiracy to allow more people to be civilly committed,” that there is a sexual interest in adults or prepubescent children, with nothing in between, and that when “somebody behaves sexually towards an 11 year old in Tanner stage 2, this is either an overflow of pedophilia or an overflow of an adult sexual preference” (Thornton tr at 639).
“The biggest piece of this ... is the APA for a variety of reasons is opposed to civil commitment, and various people who are sympathetic to that position have argued that these diagnoses would make it easy for people to be committed and, therefore, we should decide what diagnostic practice we should have on the basis of how we speculate and manifest SVP commitment. We should decide what diagnostic practice we should have primarily on what the science tells us is what I say and it is not [my] place, as if you like, an expert in para-philias and things like this to tell society how society should organize its institutions and respond to things. My place is to give explanative information about the facts and not make judgments” (Thornton tr at 640).
Tanner stage 2 is similar to Tanner stage 1; Tanner stage 4 is similar to Tanner stage 5. Although a person with an erotic preference for a person in Tanner stage 4 would technically manifest a paraphilia, it would not be good practice to make such a diagnosis because of the similarity of such an erotic preference to one for a postpubescent child. Researchers who use an age proxy for hebephilia of older than 11-14 are diagnosing the condition incorrectly. The age at which a child progresses through puberty can depend on ethnicity, weight and culture; the age of puberty has been decreasing and persons can progress through puberty at different rates with respect to different pubertal manifestations. Most of the time, however, a psychiatric evaluator doing an SVP assessment will *516 not have a physical description of the victim and often use victim age to make diagnoses. Some heterosexual men respond to sexual stimuli involving females of all age groups.
Pedohebephilia would be too vague a diagnosis under the existing DSM-5. The criteria Dr. Thornton used in his study of hebephilia differed from the criteria used by Dr. Wilson in his Florida study. In addition to the pedohebephilia proposal, the sub-work group also recommended a proposal for “hypersexual disorder” which was rejected by the APA. In that case, however, the APA provided “guidance” to use an “Other Specified Impulse Control” disorder to assign the condition (Thornton tr at 681-682). Internal DSM deliberations adhere to a “code of silence,” likely because “you don’t want to see sausages being made” (Thornton tr at 682-683). Much of the PPG research Dr. Thornton has cited comes from CAMH.
Dr. Thornton discussed an important study by Dr. Blanchard and other colleagues introduced into evidence entitled, Pedophilia, Hebephilia and the DSM-5, which provided some of the impetus for the pedohebephilia proposal.[35] This study showed that men who reported maximal sexual attraction to pubescent children “had greater penile responses to depictions of pubescent children than to depictions of younger or older persons.”[36] Dr. Thornton acknowledged that there was an absence of PPG stimuli for models aged 15-18 in this study. The article also said it was not possible to demonstrate to a statistically significant degree that homosexual hebephiles responded more strongly to pubescent rather than prepubescent boys. Hebe-philia should be defined as existing where a person’s “primary preference is to somebody in Tanner stages 2 and 3” (Thornton tr at 699). A clinician can make inferences about such attractions, particularly when there are multiple underage victims. Drawing such inferences is much more difficult when there are one or two victims. With respect to sexual age preferences “to some extent all people will have some response to people of their preferred gender” (Thornton tr at 700).
Testimony of State Witness: Dr. Robin Wilson
Dr. Wilson is a psychologist who treats, evaluates, trains and consults regarding sex offenders and sex offender risk assessments. As a graduate student, he worked for Dr. Kurt Freund, who invented the PPG test and has conducted PPG testing. He *517 worked at the predecessor organization to CAMH for about six years beginning as an undergraduate. He received a Ph.D. in cognitive science in 1996. From 1998 until 2005 he was the chief psychologist for the Canadian Correctional Service. He worked at the Florida civil commitment program which is run by a private company from 2007 until 2011 and became its clinical director. Now in private practice he is retained both by the State and respondents.
American psychologists use the ICD-10 to assign billing codes for disorders. Children 10 years old or less are generally prepubertal, ages 11-14 are pubertal and children aged 15 and above are postpubertal. Research indicates that some people have a sexual preference for prepubertal children, some for pubertal children and some for both. Tanner stages 1 and 2 are more closely allied with Tanner stage 3 than Tanner stage 3 is allied with Tanner stage 4. Dr. Wilson believes there is one disorder: pedohebephilia with three subtypes rather than two different disorders (pedophilia and hebephilia). The DSM-5, by defining the erotic target preference for persons with pedophilic disorder as being “generally age 13 or younger,” will include targets who are pubertal rather than prepubertal only. This creates a “diagnostic quandary” (Wilson tr at 502).
The ICD-10 pedophilia definition includes early pubertal children aged 11-14. The DSM-5 rather than the ICD-10 is generally used in the United States for diagnostic purposes. Dr. Wilson described the members of the DSM-5 paraphilia sub-work group as “psychologists and psychiatrists with expertise with respect to paraphilias” (Wilson tr at 510). Dr. Wilson and Dr. Kurt Freund published a study in 1991 which evaluated how accurate the PPG was in correctly assigning diagnoses. The test found the PPG was 95% effective in distinguishing people who were known to have sexual interests in children from people who were not known to have such interests. This included pedophilia, hebephilia and pedohebe-philia. An earlier similar study by Dr. Kurt Freund and Dr. Ray Blanchard arrived at similar conclusions and later studies have reached similar results.
Dr. Wilson conducted a field trial with 296 offenders at the Florida Civil Commitment Center regarding the proposed DSM-5 pedohebephilia diagnosis. The trial included interviews and a questionnaire designed to elicit interests in prepubescent and pubescent children. Each offender had a diagnosis which had been originally assigned by evaluators based on the *518 DSM-4-TR. One hundred forty-five offenders had been diagnosed with pedophilia and 39 diagnosed with paraphilia NOS “adolescent victims.” Of the 145 pedophilia offenders, 10 were found to meet the criteria for the hebephilia subtype. Of the 39 “adolescent victims” offenders, 13 were found to meet criteria for the hebephilia subtype. Dr. Wilson said this latter result was significant because only roughly one third (13 of 39) of those diagnosed with the “adolescent victims” disorder met the more refined criteria for hebephilia. He acknowledged he had not submitted his study for publication in a peer-reviewed journal. The question of whether the “adolescent victims” diagnosis was legitimate was a difficult one. That diagnosis had been used as a proxy for hebephilia.
The study also measured inter-rater reliability using the sub-work group criteria and found that two evaluators agreed on the diagnosis of pedohebephilia 87.5% of the time with a Kappa of .710. However, Dr. Wilson said that the two evaluators agreed on the hebephilia subtype in only 6.25% of the cases. The results of both studies were presented to the sub-work group. With respect to the APA Board’s rejection of the pedohebephilia proposal, “they [the APA] don’t say do not diagnose hebephilia. They also don’t say you can diagnose he-bephilia. So they sort of leave us to figure it out on our own” (Wilson tr at 548-549).
Dr. Wilson described an article on the German sexual offense prevention project “Dunkelfeld.”[37] The article argues that hebe-philia is a paraphilia and should be included in the DSM. Dr. Wilson opined that hebephilia is a paraphilia based on the research conducted on the subject and his clinical experience. He also presented an article entitled Heterosexual Aversion in Homosexual Males.[38] This PPG study indicated that persons are aroused to sex in their gender preferences in descending order to adults, pubescent children, prepubescent children and younger prepubescent children and aroused to a lesser degree to all ages of persons in their non-gender preference.
Opposition to the pedohebephilia proposal arose because of a concern that a “not insignificant number of children who are at age 14 would be essentially postpubescent” (Wilson tr at 821). There are countries in Europe in which 14 is the age of consent and that was also true in Canada until recently. The research *519 on the issue, however, does not concern age but a sexual preference for an underdeveloped body shape. Thus, a sexual attraction to a 12 year old who was postpubertal would not be considered paraphilic while an attraction to a pubertal 15 year old would be.
Dr. Wilson said a psychiatrist or psychologist who did not work in the area of sexual deviance would not have expert knowledge in that field but would have a good general knowledge of mental health. The hebephilia diagnosis is used in Canada, Europe and Australia. He opined that the hebe-philia diagnosis is generally accepted among “mental health practitioners who work in the area of problematic sexual behavior” (Wilson tr at 834). Dr. Wilson acknowledged that Dr. Blanchard supervised one of his internships and that he had also worked with Dr. Zucker. Drs. Blanchard, Zucker, Freund and Wilson have all worked for CAMH. Dr. Zucker (the chair of the work group) appointed Dr. Blanchard.to be the chair of the sub-work group.
Dr. Wilson acknowledged that a pubescent or a hebephilic sexual preference has been defined by various sexual disorder researchers in different ways spanning ages 11 through 17. Tanner stages were developed on white children, beginning in 1948. Pubertal onset can depend on race, weight, culture or an absent father and the age has been decreasing over time. Different sexual characteristics can mature at different rates requiring clinical judgment to determine a subject’s Tanner stage. He agreed that an SVP evaluator “almost never” has a victim’s Tanner stage information.
Dr. Wilson discussed the conundrum caused by the DSM-5’s pedophilia definition as referring to children aged 13 or younger:
“[T]he APA includes two elements in their definition of pedophilia, that might actually be in opposition to one another. This, I think is one of the greatest difficulties that myself and others, who are on my side of the coin, have with this diagnosis. That if you are going to limit yourself to solely those children who are prepubescent, then you cannot have an upper age limit of 13, and expect that will be true in most or all cases” (Wilson tr at 837).
“[T]he reality is, if we are rarely going to know what the Tanner stage is of the victim, then those people making pedophilic diagnoses based on of *520 fenses against children who are 12 and 13, stand [a] great likelihood of making the diagnosis regarding the victims who are not prepubescent” (Wilson tr at 838).
“As far as the DSM is concerned, by setting the age limit at 13, there has to be some tacit understanding that will include some pubertal children, given that the board of trustees of the APA are all psychiatrists, they are all physicians, they know when people will be moving into puberty. It makes absolutely no sense to me, whatsoever, Your honor, for them to be completely oblivious to the fact, although they are saying prepubertal” (Wilson tr at 839-840).
Testimony of Respondent’s Witness: Dr. Karen Franklin
Dr. Franklin is a psychologist with a postdoctoral fellowship in forensic psychology who now lives in California. She has worked in prisons, in a psychiatric hospital, in a private practice focusing on forensic work and has also taught and worked on various court and governmental forensic psychology-panels. She has conducted sex offender evaluations throughout her career and currently sometimes serves as an evaluator for defendants in SVP cases but sex offender evaluations now consume only about 10-20% of her work. She conducts social science research and has published research on the hebephilia diagnosis.
Dr. Franklin opined that the diagnosis of OSPD hebephilia is not generally accepted in the scientific community. Historically, the onset of puberty has been recognized as the age “cut-off” beyond which a paraphilia does not exist. She described a “pathology” that would lead to a mental illness diagnosis to be “some sort of biological or extreme deviation from the norm” (Franklin tr at 280). The renowned sex researcher Allred Kinsey concluded that men who engaged in sexual relations with children between the ages of 12 and 15 were not abnormal or pathological.[39] The term “hebephilia” was first coined in the 1950s by one prison researcher but did not gain wider acceptance until Dr. Blanchard and his colleagues at CAMH promoted it.
Hebephilia has been defined in a wide variety of ways including ages from 11 to 18 and as including “adolescents.” *521 Adolescence is a social construct, not a biological one, and can extend into the end of teenage years and even into the 20s under some definitions. Dr. Franklin conducted research on the origins of the hebephilia concept and published an article on her research.[40] A database search for the term in 2009 found 36 legal decisions using the term, 75% of them SVP cases, virtually all after 2002 (following the advent of modern SVP statutes). Each case used a different definition for the term. She found the term “hebephilia” was obscure until the PPG studies at CAMH in 2000. The group “made what the rest of the professional community reacted to as a very extreme and bizarre proposal, to add this diagnosis the DSM-5, out of the blue.” (Franklin tr at 292.) “[R]eaction [in the psychiatric community] blew up from there.” (Id.)
2002 is the year in which Dr. Dennis Doren published Evaluating Sex Offenders: A Manual for Civil Commitments and Beyond.[41] In that manual, he described hebephilia as a condition where an offender was “sexually attracted to adolescents.” Dr. Doren acknowledged that attraction to adolescents was common among men but said a paraphilia would arise by virtue of the “degree to which someone is repetitively or chronically impaired by that attraction.” Dr. Franklin said this contention was notable because it was not premised on any significant research. Dr. Doren worked at the Wisconsin SVP program where Dr. Thornton now works.
The pedohebephilia proposal was made by Dr. Blanchard in 2009 and a massive outcry against it ensued. Thirty-five scholarly article critiques of the proposal were made after 2009 with the number of such critiques today being more than 59. The official organization for America’s forensic psychiatrists, the “American Association of Psychiatry and Law” (the AAPL) had a decidedly negative reaction to the proposal at their 2009 meeting. The organization had a debate on the proposal in 2010, in which Dr. Franklin participated, and voted 31-2 against it. A 2010 meeting of the International Association for the Treatment of Sexual Offenders in Oslo, Norway voted 100-1 against the proposal.
Dr. Franklin was one of 123 mental health professional signatories of an open letter opposing the hebephilia diagnosis (and two other proposed DSM-5 sexual disorder diagnoses) *522 written to the president of the APA in 2012.[42] The letter asserted that
“[m]ost men are attracted to sexually maturing 14-year-olds, as reflected in the large number of industrialized countries where the age of sexual consent is 14. Normative attractions may be criminal when acted upon, but they should not be labeled as mental disorders. ‘Hebephilia’ is an archaic term that languished in psychiatric obscurity until the passage of modern civil commitment laws in the United States. . . . Most of the research has been conducted by a single Canadian research team that is overly represented on the Paraphilias Subwork-group.”
Dr. Jerome Wakefield, a social work professor and prominent scholar in the field of psychiatric diagnosis, opposed the hebe-philia diagnosis in his article.[43] He argued that the DSM-5 pedophilia criteria “generally age 13 years or younger” “is supposed to set a rough upper limit on pubescence, not define the target children as any child up to thirteen years old.”[44]
Drs. Allen Frances and Michael B. First argued against the adoption of the hebephilia diagnosis in their opinion article.[45] The authors noted that they were the chair and editor of text and criteria for the DSM-4 Task Force and in their article sought to correct what they asserted were misinterpretations of the manual’s language. The paraphilia definition in the DSM-4 (outlined at n 11, supra) included sexual interests in children and other non-consenting persons but the authors asserted this was intended to be part of a “table of contents” for the eight named paraphilias (such as pedophilia) rather than the basis for the creation of a hebephilic paraphilia.
They noted that under the DSM-3, the essence of a paraphilia included the requirement that “unusual or bizarre imagery or acts are necessary for sexual excitement” but that this standard was abandoned due to its inherent subjectivity in the DSM-4.[46] They argued that sexual attraction to pubescent children was neither unusual nor bizarre. Regarding the “generally age 13 *523 years or younger” qualification in the DSM-4 (and DSM-5) criteria for pedophilia the authors argued: “the phrase was included simply for the purpose of providing a general upper age limit for the construct prepubescent, one that made more sense in the late 1980s than it does now with the steady decline in the age of attaining puberty.”[47] The Frances article asserted that hebephilia was not noted as an example of a paraphilia NOS because no one ever suggested it. The authors asserted that “[w]hile the NOS [now OSPD] categories are essential for clinical practice, they are usually inappropriate and misleading when applied to consequential forensic SVP deliberations.” (Id.)
“[T]he research evidence supporting the inclusion of a new diagnosis of hebephilia is remarkably sparse and almost completely irrevelant.”[48] “It is fallacious to assert that having sexual urges involving pubescent youngsters is sufficient for a diagnosis of a mental disorder. Having such urges is normal; acting on them is a serious crime, not a mental disorder.”[49] “It is a great and puzzling paradox that the [APA] has taken an extremely strong position opposing SVP statutes as a misuse of psychiatry while its [work group] is suggesting a diagnosis that would provide great impetus to increased SVP involuntary commitment.”[50]
Dr. Franklin analyzed “general acceptance” among various psychiatric communities. She conducted a literature review of commentaries or studies on the hebephilia diagnosis. She found that of 116 scholarly articles on thé subject 51% were negative, 26% mentioned the issue but did not take a position, 13% were favorable but came from CAMH and 10% were favorable but did not come from CAMH. Comparing the 71 articles which took a position but excluding the CAMH articles, she found that 83% opposed the diagnosis and 17% were in favor of it. She outlined a number of prominent scholars and researchers who opposed the diagnosis, many of whom are discussed here. She also analyzed general acceptance among six distinct psychiatric communities.
She opined that among organized psychiatry and psychology in the United States generally, the diagnosis was not generally accepted. She said the issue was not widely known but that *524 the overall position was negative. She based this primarily on a literature review as well as debates on the issue. She also said the diagnosis was not generally accepted among forensic psychiatry and psychology. This is evidenced by the opposition of the primary professional organization, AAPL (noted, supra) as well as her experience in addressing the issue with forensic colleagues and the number of forensic psychiatrists or psychologists who have expressed explicit opposition. Sexuality researchers and academic scholars on sexuality also do not generally accept the diagnosis, which is confirmed by the research review she conducted.
With respect to sex offender clinicians, as represented by the Association for the Treatment of Sexual Abusers (ATSA) she opined that the diagnosis was not generally accepted but that there is “polarization” since some members of this community do support it. CAMH evaluators and evaluators employed by states in SVP programs who are in the organization support the diagnosis. Drs. Blanchard and Cantor have leadership positions in ATSA and they support it. With respect to evaluators who work in SVP proceedings, those employed by the State might support it while those employed by defendants do not. With respect to evaluators working for both sides there is polarization.
Drs. Robert Prentky and Howard Barbaree, in their opinion article Commentary: Hebephilia — A Would-be Paraphilia Caught in the Twilight Zone Between Prepubescence and Adulthood[51] (discussing the pedohebephilia proposal) acknowledged that hebephilia critics did not disagree with the scientific conclusion that “some individuals are maximally aroused by adolescents.”[52] They noted however, that the pedohebephilia proposal resulted in a “flurry of criticism” {id. at 507). Some critics have noted that an argument for the hebephilia diagnosis is that there is an overlap between persons sexually aroused to prepubescent and pubescent children. But there is also an overlap between persons aroused to pubescent children and adults. Adolescents are sexualized in advertising and the media, further supporting the notion that arousal to such children is normative. The authors noted that the proposed diagnosis was supported by SVP prosecutors and opposed by SVP defense lawyers.
*525 Dr. Franklin summarized what she believes are the main scientific critiques of the diagnosis. First, the research supporting it has been conducted by only one group, CAMH. The primary study on which the diagnosis was based had significant flaws. The study did not find a differential attraction to pubescent children among homosexuals, only heterosexuals. It did not compare an arousal to pubescent children against an arousal to children aged 15-18 (only comparing the arousal to adults and prepubescent children). Therefore, a hebephile might be equally or more attracted to a teenager in this older age group. She also asserted the study excluded eligible participants. An attraction to pubescent children is normal, as evidenced by cross-cultural studies and marriage laws, is evolutionarily adaptive and has gained credence only because of SVP statutes.
Dr. Franklin briefly discussed an article by the bioethicist Patrick Singy, which was received in evidence.[53] Professor Singy argues that the pedohebephilia proposal was rejected because it presented “a thoroughly political question.”[54] Blanchard’s view was that his research was not contingent on how it might be used forensically, but the validity of the hebephilia diagnosis is inextricably intertwined with how it might be used in SVP proceedings. Singy argues that politics (by which he largely means the manner in which diagnoses will be used forensically) “is deliberately woven into the fabric of the manual [the DSM].”[55] The rejection of the pedohebephilia proposal “is . . . best understood as a worry about the use and abuse of psychiatry for forensic purpose.”[56] Singy notes that a 1999 APA task force report on dangerous sex offenders asserted that SVP statutes “represent a serious assault on integrity of psychiatry” and “threaten to undermine the legitimacy of the medical model of commitment.”[57] “Had the APA been . . . strongly in favor of SVP laws, it is a very safe bet to say that hebephilia would have found a place in the DSM-5.”[58]
Using age as a proxy for a hebephilic sexual preference is problematic because pubertal onset is highly variable. Hebe-philia cannot be diagnosed without an examination of a victim *526 by a trained clinician at the time of an offense. She said that PPG tests are not reliable or valid, that they cannot be reliably replicated and that subjects can fake PPG responses. PPG results suffer from a range of consistency problems. Among these are differences in assessment methods, stimuli, technicians, differences in control groups, differences in subjects and differing statistical methods used to interpret results.[59] Field trials conducted on the proposed pedohebephilia diagnosis in Wisconsin, Florida and California were never published in peer-reviewed journals.
Dr. Franklin testified that “the onset of puberty has generally been recognized as the cutoff for pathology” (Franklin tr at 895). At least half of offenders who molest prepubescent children cannot be diagnosed as pedophiles because there are many reasons an offender molests a child, including opportunistic reasons for incest offenders. She said that the introductory text of the DSM-5’s paraphilia section was written by Dr. Blanchard and “may have been intended by Dr. Blanchard as a back doorway to get hebephilia in that’s completely improper if that is the case” (Franklin tr at 916).
Testimony of Respondent’s Witness: Dr. Charles Ewing
Dr. Ewing has a Ph.D. in psychology from Cornell University, did a postdoctoral fellowship at Yale University and has a law degree from Harvard Law School. He has taught at Buffalo Law School for 33 years where he is a “distinguished service professor” and also has a forensic psychology practice. He has evaluated sex offenders for almost 40 years and done work on article 10 cases. He normally testifies for respondents in article 10 cases but has also testified for the State a couple of times. He is the editor of a psychological journal and has published peer-reviewed studies and papers. He has published 10 books including one which addresses hebephilia called Justice Perverted. He is on the Board and a former president of the American Board of Forensic Psychology. He has served as a consultant to numerous government agencies including the Defense Department working on issues concerning the Guantanamo detainees.
Dr. Ewing opined that OSPD hebephilia was not a generally accepted diagnosis in the scientific community. He said the appropriate community to consider with respect to that question *527 was “people who do work, either research or clinical work or forensic work, with sex offenders” (Ewing tr at 720). He based this view on several considerations. The proposal for pedohebe-philia was rejected for inclusion in the DSM-5. He noted Dr. Blanchard’s statement that if the pedohebephilia proposal was rejected for inclusion in the DSM-5 it would not constitute a mental disorder. Dr. Ewing said the hebephilia diagnosis is only used in SVP cases and that if it were legitimate you would expect to see it used in other contexts including other forensic settings. The diagnosis is not used except by a handful of state evaluators. It is “more of a political than a clinical term” since it is only used to restrict the liberty of certain sex offenders (Ewing tr at 724).
Hebephilia is also not a valid diagnosis because it does not lead to any specific sex offender treatment, in contrast to some other paraphilias. The proposal was approved by the sub-work group only because of the support of Dr. Blanchard and his CAMH colleagues. Dr. Ewing asserted that although his experience with SVP programs was limited, he believed hebephilia is not a generally accepted diagnosis among state evaluators in SVP programs or evaluators who assessed respondents. He said he had seen it used by a handful of evaluators employed by OMH but did not know if it was generally accepted among those evaluators.
Hebephilia is not defined consistently and is used to describe both pubescent children and children up to age 17. It has sometimes been defined by age ranges, like 11-14, and sometimes by Tanner stages but psychiatric examiners generally will not know which Tanner stage a sexual assault victim was in at the time of an offense. Age is used as a proxy but it is not an accurate one, since, for example, an eight year old might be pubescent and a 16 year old might not be. In theory, there are cutoffs between Tanner stages but in practice there are often not clear distinctions and the rate of sexual development varies depending on race and ethnicity. Part of the reason hebephilia is not generally accepted is that it cannot be precisely defined.
To the extent hebephilia is used as a diagnosis today, it is called hebephilia rather than pedohebephilia. He opined that the ICD-10 is never used by psychologists and psychiatrists in the United States to assign diagnoses except for billing purposes. The inclusion of early pubescent children in the ICD-10’s definition of pedophilia was contrary to the DSM-5. Dr. Ewing does not believe any paraphilia, other than one of *528 the eight named paraphilias, can be legitimately diagnosed in a forensic setting although he acknowledged the DSM-5 obviously provides for OSPD diagnoses and acknowledged that such diagnoses are useful in some contexts. The OSPD category is too open-ended and could include, for example, a person who preferred solitary masturbation or viewing pornography to engaging in sexual relations with a human partner.
Dr. Ewing said it was not rare for adult men to be attracted to pubescent children, particularly pubescent girls. This has been demonstrated in cross-cultural studies and through PPG tests and it is only in the past 50-100 years that sex with pubescent children has been criminalized in the United States. The fact that sex with pubescent children has been criminalized is legitimate but that does not make an attraction to such children a mental illness. He opined that PPG tests were not reliable because there were no standards for how they are administered or interpreted and therefore the test cannot be reliably replicated by different evaluators. The test is standard to the extent it measures blood flow to the penis but not in other respects. Some people perform the test with as little as one week of training. It should only be performed by medical professionals but it is conducted in at least one New York SVP facility by psychologists. The PPG test is “primitive” and there are many reasons other than sexual arousal that blood flow to the penis may be increased. A more sophisticated instrument has not been developed because there is no market for it outside SVP proceedings. Dr. Ewing said that a colleague of Dr. Blanchard, Dr. James Cantor, had described the PPG test as somewhere between perfect and worthless.
The PPG test is used by Dr. Blanchard’s group in Canada for research purposes but Dr. Ewing does not believe PPG tests have indicated that some men are aroused more by pubescent than adult subjects because PPG tests are not reliable. Examiners never have PPG results when they initially evaluate respondents for article 10 proceedings although such results are used for confined offenders subject to article 10 retention hearings.
Dr. Ewing does not believe the paraphilia definition (cited, supra) which includes, in part, an “intense and persistent” sexual interest in other than consenting human adults, means hebephilia is a legitimate diagnosis because reading this definition as including any sexual interest outside this defined norm *529 would sweep too broadly. He also asserted this provision was the result of “political give and take” in writing the DSM-5 (Ewing tr at 756). The sentence following that general definition in which the DSM-5 says that a paraphilia can be defined as a sexual interest greater than or equal to the manual’s defined “normophilic” sexual interest was intended, in accordance with the language of the preceding sentence (also outlined, supra), to apply to persons who were too old or medically ill to have intense and persistent sexual interests. He acknowledged, however, that this was not the only circumstance under which the “greater than normophilic” criteria could be used under the manual. That provision and the following sentence, (again outlined, supra) which provides that some paraphilias can be described as preferential rather than intense sexual interests does not support the hebephilia diagnosis. He also asserted that the DSM-5’s requirement that a sexual interest be “intense and persistent” was a difficult concept to apply since it was “totally subjective” (Ewing tr at 791).
Although Dr. Ewing initially testified that the only persons performing research on hebephilia were Dr. Blanchard’s group, he acknowledged that additional research had been conducted in Germany where persons were asked to self-identify their attraction to pubescent children. In Dr. Blanchard’s studies, he compared attractions to children between 11-14 and adults and did not consider sexual attractions to 16-, 17- or 18-year-old children. This was a deficiency in these studies.
Testimony of Respondent’s Witness: Dr. Cynthia Calkins
Dr. Calkins has been a licensed psychologist since 2003, has a Master’s degree in legal studies and is a professor of psychology at John Jay College of Criminal Justice who specializes in the study of sexual offenders. She conducts and supervises research on sexual offending, teaches and supervises students doing clinical work. She opined that the diagnosis of OSPD he-bephilia is not generally accepted in the scientific community.
Dr. Calkins described Tanner stages 2, 3 and 4 as being gradations of pubescence. She opined the diagnosis was not generally accepted in the broad psychiatric community as evidenced by its rejection as a specified paraphilia in the DSM-5. Most of the scientific literature on the diagnosis has been critical of it. It is not generally accepted by forensic mental health professionals as evidenced by its rejection by 82% of AAPL members during a “mock trial” of the diagnosis in 2010. Among psychiatrists and psychologists who work with *530 sexual offenders, two organizations can be looked to, the ATSA (of which Dr. Calkins is a member) and the International Association for the Treatment of Sexual Offenders (IATSO). IATSO conducted a poll prior to the publication of the DSM-5 in which their membership rejected the diagnosis by a vote of 100-1. Within ATSA, the hebephilia diagnosis came up for discussion “[infrequently if ever” prior to the DSM-5 proposal (Calkins tr at 121). Some state evaluators employed in SVP programs use the diagnosis but they “are really the only ones using this.” (Id.) It is not generally accepted by defense SVP evaluators. State SVP evaluators, however, are likely about .25 of one percent of psychologists or psychiatrists in the United States. Dr. Calkins has never seen the diagnosis used outside SVP programs.
Hebephilia has been defined inconsistently and some have described it as including children up to age 18. Tanner stages were developed by assessing white children and pubertal development can vary by weight and ethnicity. Dr. Calkins has never seen a Tanner stage described in a record concerning a sexual assault victim. Regarding the 13 year old or younger age description for pedophilia in the DSM-5, Dr. Calkins said “that’s been somewhat confusing to me” (Calkins tr at 134). Blanchard’s 2009 study was not able to distinguish same-sex attraction for prepubescent vs. pubescent children. The diagnosis has been promoted by a small group of CAMH researchers. It is also relevant that in addition to its rejection as a named paraphilia, hebephilia was not included in the DSM-5 “Appendix” as a condition for further study. When Dr. Blanchard initially proposed a hebephilia paraphilia in 2009, the “proposal stirred quite a bit of controversy to say the least” (Calkins tr at 149). There were then seven letters to the editor of the Archives of Sexual Behavior following the initial proposal, all negative, which was unusual for such a proposal. A lot of controversy and debate followed, with most people challenging the diagnosis. “[I]t’s one thing to be able to identify it [hebephilia], it’s quite a leap to say that therefore it is and ought to be a disorder” (Calkins tr at 150).
Persons affiliated with CAMH supported the diagnosis but the “bulk of the field” challenged its legitimacy (Calkins tr at 153). The “political” argument against the diagnosis was: “we have dangerous offenders on the street. They don’t qualify for any existing diagnosis. What do we do here, so we come up with some new diagnosis that will fit this need in the system” *531 (Calkins tr at 155). The desire of critics was to be cautious and not simply come up with a diagnosis to lock people up. While there have been many opinion pieces written about the diagnosis, “there’s only been a handful of research studies” on it (Calkins tr at 157). Other reasons to not adopt a hebephilia diagnosis are the lack of any studies about the future course of the disorder were it diagnosed, the lack of any studies of hebe-philia’s cause and the fact that viewing sex with pubescent children as problematic is relatively recent in history. Before the 1900s the age of consent in the United States was generally 10. It increased to around 13 in the early twentieth century.
Sexual relations between adult and pubertal males has also been documented throughout history and across cultures. A number of other countries have or until recently had consent ages ranging from 12 to 14 years old. A sexual attraction to pubescent youth is not rare and a leading analysis of the issue considering historical, cross-cultural and evolutionary issues concluded a sexual attraction to early pubertal children should not be defined as a paraphilia.[60] Pubertal females are at their highest reproductive value. The fact that some men have a preferential erotic interest for pubescent children doesn’t make that preference a pathology. Hebephilia has also not been subject to “cross-validation” studies showing how well the diagnosis works in settings other than those in which the diagnosis was developed.
Conclusions of Law
III. The Frye Standard
The Frye test considers the “question of whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally.” (People v Wesley, 83 NY2d 417, 422 [1994]; see also Parker v Mobil Oil Corp., 7 NY3d 434 [2006].) The scientific principle “must be recognized” and “sufficiently established to have gained general acceptance in the particular field in which it belongs.” (Wesley at 422-424 [emphasis omitted], quoting Frye.) “The Frye test emphasizes ‘counting scientists’ votes, rather than on verifying the soundness of a scientific conclusion.’ ” (Id. *532 at 439 [Kaye, Ch. J., concurring]; see also People v LeGrand, 8 NY3d 449 [2007].) Under the Frye test, the burden of proving general acceptance rests on the party presenting the disputed evidence. (Zito v Zabarsky, 28 AD3d 42, 44 [2d Dept 2006].) General acceptance can be established through “texts and scholarly articles,” expert testimony and judicial opinions. (People v Wernick, 215 AD2d 50, 52 [2d Dept 1995], affd 89 NY2d 111 [1996].) As Judge Abdus-Salaam, then writing for the First Department, explained, the Frye test
“often involves considering whether a sufficient quantum of other experts in the same field accept the reliability of the theory or process . . . Since the implication of this approach is that it entails a process of weighing the views of each side’s experts, it is not surprising that a trial court would be tempted to weigh the relative merits of the experts introduced by each side to decide whether the proposed expert testimony is reliable. However, even where the court’s task is weighing, or counting, the scientists’ votes, nevertheless, it is not the court’s job to decide . . . which expert’s conclusions are correct.” (Marsh v Smyth, 12 AD3d 307, 311 [1st Dept 2004].)
In Zito v Zabarsky the Court held that “general acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions.” (28 AD3d at 44, quoting Matter of Rezulin Litig., 2002 NY Slip Op 40431[U], *6-7 [Sup Ct, NY County 2002].) The First Department recently cited that proposition with approval in Sadek v Wesley (117 AD3d 193 [1st Dept 2014], affd 27 NY3d 982 [2016]).
The first question under the Frye test is which scientific community should be assessed to determine general acceptance. This court faced the same issue in State v Kareem M., where the court considered whether the diagnosis of OSPD non-consent was generally accepted. In Kareem M., this court considered three possibilities. The first was psychologists and psychiatrists generally. The second was psychologists or psychiatrists who had as a meaningful part of their practice the evaluation, diagnosis or treatment of sex offenders, or performed research in that field. The third was psychiatrists and psychologists who worked in SVP proceedings. The court *533 surveyed a wide range of New York case law touching on the issue and concluded that the best analysis of it had been conducted by former Chief Judge Kaye, in her concurring opinion analyzing the general acceptance of DNA evidence in People v Wesley. There, she explained:
“If the field [through which general acceptance is measured] is too narrowly defined, the judgment of the scientific community will devolve into the opinion of a few experts. The field must still include scientists who would be expected to be familiar with the particular use of the evidence at issue, however.” (People v Wesley, 83 NY2d at 438 [Kaye, Ch. J., concurring] [citation omitted].)
In accordance with that standard, this court held in Kareem M. that it was the middle of these three scientific communities which should be assessed to determine general acceptance of the OSPD non-consent diagnosis: persons who regularly evaluated, diagnosed or treated sex offenders or who performed research in that field. This court has reached the same conclusion here for the same reasons this court outlined in more detail in State v Kareem M.
IV. New York Case Law Concerning Hebephilia
The Court of Appeals Decision in Matter of State of New York v Shannon S.
In Matter of State of New York v Shannon S. (20 NY3d 99 [2012], cert denied 568 US —, 133 S Ct 1500 [2013]), the Court of Appeals in a 4-3 decision found evidence legally sufficient to sustain an article 10 mental abnormality finding where the respondent was diagnosed with paraphilia NOS hebephilia under the DSM-4-TR.[61] The respondent had been found guilty of engaging in sexual relations with “nonconsenting or underage, adolescent victims.” (20 NY3d at 102.) He had sexual intercourse with a 15 year old, forcibly raped and sodomized a 13 year old, had a sexual relationship with a 16 year old and was charged with sexual abuse at age 19 with a victim whose age was not provided. That final charge was resolved by a disorderly conduct plea.
One state doctor said the respondent had a “deviant sexual interest in adolescents below the age of consent” and “a *534 compulsive attraction to minor, adolescent females.” (Id. at 103-104.) The Shannon S. majority said this doctor had described “sexual relationships with pubescent females” which resulted in “a compulsive attraction to minor, adolescent females.” (Id. at 104.) A second state doctor, Stuart Kirshner, defined the respondent’s condition as “Paraphilia NOS Hebe-philia,” which he described as an “apparent attraction to pubescent girls.” (Id.) The respondent’s expert, Dr. Ewing (who also testified at the instant hearing), said there was insufficient evidence to demonstrate Shannon S. was particularly aroused by teenaged girls and that “most males are sexually attracted to fully formed pubescent women.” (Id. at 105.)
The majority found the hebephilia diagnosis valid, holding that the NOS designation under the DSM-4-TR could be applied at an article 10 trial even though it was not one of the DSM’s specifically defined paraphilias. The majority found the testimony of the State’s experts regarding the respondent’s “sexual offenses against adolescent victims demonstrated an attraction to nonconsenting minors that satisfied the plain definition of paraphilia NOS and evinced symptoms of hebe-philia.” (Id. at 107-108.)
Judge Smith, dissenting with Judge Pigott and Chief Judge Lippman, would have vacated the judgment. The dissenters described the “hebephilia” diagnosis as “junk science devised for the purpose of locking up dangerous criminals” and expressed “grave doubt” the diagnosis would survive a Frye hearing. (Id. at 110.) They found the hebephilia diagnosis as applied was insufficient to distinguish the respondent from a statutory rapist convicted in an ordinary criminal case and thus failed to meet the substantive due process requirements applicable to SVP statutes. Distinguishing “hebephilia” from the legitimate diagnosis of pedophilia, Judge Smith opined:
“[T]he idea that a man’s mere attraction to pubescent females is abnormal is absurd. What is abnormal about appellant, and others who commit statutory rape by having sex with girls below the age of consent, is not that they find the girls attractive, but that they are willing to exploit them for their sexual pleasure — in other words, they commit statutory rape.” (Id. at 111.)
As will be seen, the dissenters’ views subsequently obtained greater credence in the Court’s seminal decision in Matter of State of New York v Donald DD. and Matter of State of New *535 York v Kenneth T (24 NY3d 174 [2014]), specifically in the Kenneth T. portion of the decision. Before discussing Kenneth T, however, it is worth pausing to note two issues raised by Shannon S.
First, it seems apparent that Shannon S. did not have hebe-philia, at least as that term was defined by every expert at the hearing. Hebephilia was defined during the hearing as a preferential attraction to pubescent children. The Shannon S. majority, however, repeatedly described the condition as being manifested by an erotic preference for underage adolescents. Indeed, two of the respondent’s three victims whose ages were provided were beyond the hebephilic age proxy uniformly provided by the hearing experts (ages 11-14). No age was given for the fourth victim but the respondent was only 19 at the time of that crime. Assuming hebephilia is a legitimate diagnosis, Shannon S., like many SVP respondents, was apparently diagnosed with the condition not based on evidence he was preferentially attracted to underdeveloped pubescent body types but because he offended against underage victims.
The second striking aspect of the decision came in the dissenting opinion which appeared to take a position squarely on one side of the debate about whether an arousal to pubescent children is normal. To the dissenters, such arousal was not only normal. They opined that the view that an attraction to pubescent children was abnormal was “absurd.” On the other hand, given the conflation of the two very different terms “adolescent” and “pubescent” throughout the decision, whether the dissenters, in using the word “pubescent,” were actually referring to pubescent children is not clear. That is, it is not clear the dissenters took the position that it was “absurd” to suggest that a sexual attraction to an 11-year-old child (or an eight-year-old child who was pubescent) was deviant. What they may have been trying to convey was that an attraction to a postpubescent adolescent minor was not deviant (a proposition for which there was uniform agreement at the hearing).
The Court of Appeals Decision in Matter of State of New York v Kenneth T.
In Kenneth T., the Court found evidence the respondent suffered from a mental abnormality legally insufficient to demonstrate he had “serious difficulty” controlling his sexually offending behavior and vacated the article 10 judgment against him. Kenneth T. was diagnosed with ASPD, and paraphilia NOS involving an attraction to non-consenting partners *536 (non-consent). The diagnosis in Shannon S., on the other hand, was NOS hebephilia. Paraphilia NOS hebephilia and paraphilia NOS non-consent are two of hundreds of paraphilias which have been described under the “NOS” (or now DSM-5 equivalent OSPD) categories. Beyond both being paraphilias without defined DSM criterion sets, they have little in common.
The Kenneth T. majority, however, treated the diagnoses of hebephilia (in Shannon S.) and non-consent (in Kenneth T.) as being the same for purposes of analyzing the general acceptance question, since both diagnoses had the “NOS” prefatory designation. In discussing Kenneth T.’s diagnosis of non-consent, based on his completed and attempted forcible rape of postpubescent victims, the majority first discussed the fact that it had upheld the NOS diagnosis in Shannon S. and found that issues concerning the legitimacy of that diagnosis went to its weight and not its admissibility. The Court then said:
“Paraphilia NOS is a controversial diagnosis. It is listed in the current edition of the [DSM, that being the DSM-4-TR], but only as a ‘catch-all’ category for paraphilias that are not specifically enumerated elsewhere in the manual because they are ‘less frequently encountered.’ ... In the dissent in Shannon S., three members of this Court who are now in the majority stated our view that the paraphilia NOS diagnosis presented by Dr. Kirsh-ner and another expert witness in that case ‘amount[ed] to junk science devised for the purpose of locking up dangerous criminals’ and we expressed ‘grave doubt’ whether such a ‘diagnosis would survive a Frye hearing to determine whether it is “sufficiently established to have gained general acceptance” in the psychiatric community.’ ” (24 NY3d at 186, quoting Shannon S., 20 NY3d at 110 [Smith, J., dissenting] [internal quotation marks omitted].)
The Court said it would not overrule Shannon S. based on principles of stare decisis because there was “no compelling justification for overruling Shannon S.’s holding that a diagnosis of paraphilia NOS was sufficient to support a finding of mental abnormality on the record in that case.” (Id. at 187.)
“We did not, however, decide in Shannon S. the question that would be decided at a Frye hearing: whether the diagnosis of paraphilia NOS, as testified to by the State’s experts, has received general acceptance in the psychiatric community. Nor do *537 we decide that question today, because here, as in Shannon S., no Frye hearing was requested or held.” (Id.)
As this court outlined in Kareem M., these last two sentences have spawned a wave of often duplicative Frye hearings on non-consent, hebephilia and other article 10 diagnoses and procedures, including this one. Those Frye issues are likely to consume our trial and appellate courts for years to come.[62]
In Shannon S., then, a closely divided Court found the hebe-philia diagnosis valid. In Kenneth T, however, a closely divided Court cited with approval the Shannon S. dissent’s contention that the hebephilia diagnosis was “junk science devised for the purpose of locking up dangerous criminals” and expressed “grave doubt” the diagnosis would survive a Frye hearing. That favorable citation, however, arose in a case with a completely different diagnosis, non-consent. It is finally worth noting that of the seven judges who participated in the Kenneth T. decision, four no longer serve on the Court with a fifth (Judge Pigott) scheduled to retire at the end of this year. What our Court of Appeals may eventually decide regarding the hebe-philia diagnosis after Shannon S. and Kenneth T is anyone’s guess. What does seem clear after Kenneth T, however, is that the validity of OSPD diagnoses like hebephilia under article 10 should be assessed under the Frye standard where a party properly moves for such an assessment.
The Court of Appeals Decision in Matter of State of New York v Dennis K
In its recent decision in Matter of State of New York v Dennis K. (27 NY3d 718 [2016]), the Court of Appeals addressed a number of issues related to the legal sufficiency of article 10 diagnoses in considering three appeals, one of which, State v Dennis K, is relevant here. In that case, the Court found the diagnoses of paraphilia NOS non-consent along with ASPD legally sufficient article 10 predicates. The Court said, however, that like the Shannon S. and Kenneth T. cases, “to the extent that respondent challenges the validity of paraphilia NOS as a predicate ‘condition, disease or disorder,’ we need not reach that argument because he did not mount a Frye challenge to the diagnosis.” (27 NY3d at 734.) Dennis K. then, again appeared to affirm that courts should conduct Frye assessments *538 of article 10 NOS (now OSPD) diagnoses when they are properly sought.
Trial Court Decisions Concerning the General Acceptance of the Hebephilia Diagnosis
In Matter of State of New York v Vanderpool (Sup Ct, Erie County, May 26, 2016, Michalski, J., index No. MH45118-2013), the court found the hebephilia diagnosis is generally accepted in the scientific community. The court’s decision followed an extended Frye hearing which included many of the same witnesses and evidence presented here. The court’s conclusions (following its recitation of the Frye test) are provided in their entirety here:
“With these standards in mind [the Frye standards], we conclude that Hebephilia is a diagnosis generally accepted in the relevant scientific community, Id. Though Hebephilia was excluded from the DSM V, the paraphilia sub-group, i.e. the ‘particular field’ (Wesley)[63] and ‘relevant scientific community’ (Id.) vis-a-vis this matter, recommended its inclusion. Moreover, Hebephilia was included, albeit under differing terminology, in the ICD X. Accordingly, Petitioner will be allowed to introduce evidence of the diagnosis.” (Vanderpool, slip op at 4.)
The court in Matter of State New York v Hugh H. and Matter of State of New York v Martello A. (Sup Ct, Suffolk County, July 20, 2016, Pitts, J., index Nos. 14158/15, 16768/14) also conducted a Frye hearing featuring many of the same witnesses and evidence presented here on whether the diagnoses of OSPD hebephilia and OSPD “underage males” were generally accepted. The court concluded that neither diagnosis met the Frye standard. With respect to hebephilia, the court found that there had been numerous definitions given to the term and that “without a consensus as to the definition, it would be hard to claim general acceptance” (slip op at 2); that the disorder had been rejected for inclusion in the DSM-5; that an erotic interest in pubescent children was not abnormal; that Dr. Franklin’s literature review had indicated widespread opposition and that the diagnosis had been advocated primarily only by CAMH researchers.
In Matter of State of New York v Mercado (50 Misc 3d 512 [Sup Ct, Kings County 2015, Riviezzo, J.]), the court also *539 conducted an extended Frye hearing featuring many of the same witnesses and evidence presented here and ruled that the diagnosis “OSPD (sexually attracted to teenage females)” was not generally accepted. The court rejected the State’s application to rule on the general acceptance of the OSPD hebe-philia diagnosis, however, because even though much of the hearing testimony addressed that issue, the State’s doctor did not diagnose the respondent with hebephilia. Thus, the court found it did not have jurisdiction to determine the hebephilia general acceptance question. With respect to the “teenage females” diagnosis, the court said that “[a]ll six experts [who testified at the Frye hearing] agreed that biologically there is nothing pathological or abnormal about adult heterosexual men having a sexual attraction to post-pubescent females” (50 Misc 3d at 525 [citations omitted]). In Matter of State of New York v Maxson (Sup Ct, Fulton County, June 15, 2016, Hoye, J., index No. 2013-01206), the court denied an application for a Frye hearing on the hebephilia diagnosis both because the respondent had not submitted an expert affidavit contending the diagnosis was novel and in reliance on the trial court’s ruling in State v Vanderpool.
Additional New York Article 10 Decisions Addressing Hebephilia
In Matter of State of New York v Alfredo M. (96 AD3d 1068 [2d Dept 2012], lv denied 19 NY3d 816 [2012]), the respondent was found to have a mental abnormality based on evidence he sexually abused children aged 7, 8, 13 and 15. The State’s expert testified she could not diagnose the respondent with pedophilia, since there was no evidence he had evidenced a paraphilic interest in prepubescent children for more than six months as required by the DSM. However, she did diagnose him with hebephilia since his sexual abuse of “adolescents” had occurred over more than a six-month period. The one adolescent who met that criterion, according to the decision, was the 15 year old. The Court found the evidence legally sufficient to sustain a mental abnormality finding. In Matter of State of New York v Spencer D. (96 AD3d 768, 770 [2d Dept 2012]), the Court rejected a constitutional vagueness challenge to the article 10 mental abnormality definition and upheld a mental abnormality verdict in a case where the respondent was diagnosed with hebephilia, which was defined in that case as an “attraction to post-pubescent teenage boys.”
Neither of the trial courts in these two cases apparently conducted a Frye hearing. Moreover, both cases applied a hebe- *540 philia diagnosis to postpubescent rather than pubescent children, contrary to the hebephilia definitions provided by every expert at the instant hearing. In this court’s view, neither of these decisions are binding with respect to the Frye question.
V. Preliminary Issues Related to General Acceptance
Before proceeding to the court’s analysis of the general acceptance question, some important preliminary points should be addressed.
The Pervasive Influence of Politics on the Diagnostic Validity Question
The views of the scientific community on the hebephilia diagnosis (as was true with the non-consent diagnosis this court analyzed in Kareem M.) have not been based on scientific assessments alone. They have been suffused with politics. On the one hand, diagnoses like non-consent and hebephilia have become prevalent because of SVP statutes. Absent such laws, it is questionable whether they would have received anything approaching the research attention they have garnered. Society, understandably, wants to prevent forcible and statutory rapes. Many states have enacted SVP programs to accomplish that goal. But civil commitments, under the due process principles outlined by our courts, require legitimate psychiatric diagnoses. It is not an accident, as Dr. Franklin outlined, that hebephilia became a prominent diagnosis only with the advent of SVP laws. It is also not a coincidence that each of the three expert witnesses who testified for the State at the instant hearing either work or formerly worked for state SVP programs.
Drs. Thornton, Wilson, Blanchard and others have done impressive work trying to describe and define hebephilia. Dr. Thornton said his research had not been influenced by politics; rather, he had attempted to call the science as he sees it. He testified that he tried not to have his conclusions influenced by judgments about how society should be organized. Dr. Wilson testified similarly. The court fully credits those assertions. The commitment these scientists have shown to such principles is admirable. But it is also true that the focus of research attention on hebephilia, as was true with non-consent, has arisen primarily in service to our nation’s SVP commitment system. In that sense, the attempt to describe and define these new paraphilias has furthered a political goal.
On the other hand, the APA and many in the psychiatric community are strongly opposed to SVP laws. In Kareem M., *541 this court noted that such opposition at the time of the enactment of article 10 in 2007 was so strong that the president of the New York State Psychiatric Association described a “mental abnormality” under the proposed law as “essentially a vague and circular determination that has no scientific or clinical basis . . . which usurps psychiatric terminology to achieve a social and political result” and asserted that mental health professionals “have no special expertise in assessing individuals for the presence of ‘mental abnormality’ [under article 10].” (Matter of State of New York v Kareem M., 2016 NY Slip Op 50427[U], *23-24 [citation omitted].) In accordance with such views, the respondent’s witnesses at the hearing offered no pretense of neutrality. Dr. Franklin, for example, although armed with impressive and largely credible research, did not appear at the hearing to provide an objective analysis. She came to assert her strongly held views.
Dr. Thornton described the politics surrounding SVP laws as the “biggest piece” of the opposition to a hebephilia diagnosis. Drs. Frances and First in their article described it as a “great and puzzling paradox” that the APA had taken such a strong position against SVP statutes while the sub-work group had proposed a diagnosis which would provide “great impetus to increased SVP involuntary commitment.”[64] Bioethicist Dr. Patrick Singy described the pedohebephilia proposal as “a thoroughly political question.” He noted that a 1999 APA task force report asserted that SVP laws were “a serious assault on integrity of psychiatry.”[65] Even defenders of the DSM approval process, like Dr. Appelbaum, have been hard pressed to deny the pervasive influence of politics on the APA’s decision-making. He noted that although opposition to SVP commitments was “not a reason in itself” to reject hebephilia it “lent weight to the calls for caution in making such a change in the face of limited empirical support.”[66] A political consultant could not have phrased it more carefully.
The political concerns which have informed APA diagnostic judgments on paraphilic disorders are not necessarily illegitimate. But when compared to the kinds of issues which generally arise in other Frye hearings, they are extraordinary. DNA scientists, for example, might disagree about whether a particular technique for matching crime scene evidence to a *542 subject’s genetic profile was valid. But there are likely few who would oppose the use of a technique because it would then be applied in a system (the criminal law) which was itself wholly illegitimate. That is not to discount the foundational concerns which have been raised about our criminal justice system. But those disputes generally do not concern whether we should have a criminal justice system at all.
Such conflicts reflect the conundrums of SVP laws, seen by their advocates as vital public safety measures which prevent some of the most horrific crimes known to humanity and by opponents as unconstitutional preventive detention regimes based on junk science which result in lifetime confinement. The Frye test, however, is based on whether a diagnosis is generally accepted in the scientific community. It thus effectively delegates the determination about whether a psychiatric diagnosis can be applied in legal settings to the psychiatric profession. The court construes the community’s views and makes the ultimate Frye decision. But if the court is doing its job correctly, it is the community’s judgment, not the court’s, which dictates the outcome.
The community here, however, is openly hostile to the SVP system. It largely views the entire enterprise as illegitimate. It also largely believes there is nothing wrong with having that view influence its judgments about diagnostic validity. Having asked the psychiatric community whether a new tool which, in the community’s view, would increase SVP commitments and promote the expansion of an abhorrent civil commitment system is valid, it can come as no surprise that the answer has been “no.” As Professor Singy argued, had the APA supported SVP laws “it is a very safe bet to say that hebephilia would have found a place in the DSM-5.”[67]
The Secrecy of the DSM Approval Process
Dr. Appelbaum lauded the openness of the DSM development process and that system is transparent in a number of important ways. Proposals are, as the court understands the process, circulated among interested mental health professionals, various review committees are formed, proposals for new diagnoses are studied, critiques are circulated and extensive discussions over years are conducted. But strikingly, in this court’s view, the process through which proposed new diagnoses are approved or rejected is shrouded in a degree of secrecy which would be the envy of many totalitarian regimes.
*543 The Blanchard letter noted that members of the sub-work group signed an agreement prohibiting the disclosure of “confidential information.” He described such “confidential information” as “group discussions, internal correspondence, or any other information about the DSM-5 development process.”[68] When Dr. Wilson was asked whether there was any public explanation for the APA’s rejection of the pedohebephilia diagnosis, he replied: “None whatsoever” (Wilson tr at 548). Dr. Thornton testified that internal DSM deliberations adhere to a “code of silence” (Wilson tr at 682). The secrecy attendant to decisions on new paraphilia diagnoses, moreover, apparently pales in comparison to the lack of public knowledge about how decisions about the non-diagnostic text provisions of the DSM-5 arose. Even Dr. Appelbaum described this general text revision process as “hurried,” lacking extensive review and drafted by work groups and DSM staff through a “less-than-transparent process.”[69]
With respect to the APA’s rejection of the pedohebephilia diagnosis we do not know what the vote of the Board was, what discussion may have preceded it, what reasoning informed it or even why the APA believes such secrecy is necessary. As a private professional organization, the APA is presumably free to conduct its business as it likes. It need not abide by the disclosure rules applicable to public institutions. The secrecy inherent in the APA’s decision-making, however, in this court’s view, is inimical to the transparency with which important institutions in a free society which impact the daily lives of millions of people should operate. With respect to hebe-philia, the APA Board’s actions will have a direct impact on both public safety and the fundamental liberty interests of hundreds or thousands of people. The need for transparency with respect to the APA’s decisions, moreover, is not a theoretical concern. This court’s analysis here is lacking because it cannot know with any certainty what led the APA to take the action it did.
The Incorrect Age Proxy in the DSM’s Pedophilic Disorder Criteria
As noted supra, “pedophilic disorder” is defined under the DSM-5 as a sexual arousal to “prepubescent children.” The expert witnesses at the hearing uniformly testified that there *544 is no way to precisely correlate pubescence with any particular age. To the extent an age proxy was provided for pubescent children, however, it was uniformly identified as ages 11-14. The DSM-5, however, while noting that pedophilic disorder involves sexual arousal to “a prepubescent child or children” follows those words with the parenthetical notation “(generally age 13 years or younger)” (Wilson tr at 697). Thus, while the experts at the hearing who assigned an age proxy to pubertal children uniformly said children aged 11, 12 and 13 are pubescent, the DSM-5 defines such children as generally prepubescent. The same language also appeared in the DSM-4.
This fundamental contradiction is widely recognized by experts in the field. Dr. Blanchard in his letter described the pedophilic age proxy as not a realistic guideline and said it was “a convenience purchased at the price of accuracy and transparency.”[70] Dr. Calkins said the age description was “somewhat confusing to me” (Calkins tr at 134). Dr. Wilson described it as a “diagnostic quandary” (Wilson tr at 502) and “one of the greatest difficulties that myself and others” who support a hebe-philia diagnosis have with the DSM criteria for pedophilic disorder (Wilson tr at 837). The first question is why the authors of the DSM created this contradiction. The second is what impact, if any, it should have with respect to the instant issue. The third and most important issue (although not the ultimate question here) is how this contradiction should be applied in forensic settings.
There are initially a couple of preliminary arguments which should be dismissed. First, the drafters of the DSM obviously knew what they did. It took this court about a half hour of listening to expert testimony to understand that, to the extent age proxies have been assigned to prepubertal children by the psychiatric profession, such proxies have described such children as being less than 11. Dr. Wilson said the notion that the APA did not understand what it was doing in that regard made “absolutely no sense to me, whatsoever” (Wilson tr at 839-840). Dr. Blanchard in his letter cited data indicating that almost half of black non-Hispanic girls enter puberty by age eight. Surely the drafters of the DSM — psychiatrists and psychologists who have spent their professional lives working in this field — understood this. Second, this court does not credit the argument that this parenthetical language was merely meant *545 to set an upper age limit for prepubertal children. The parenthetical language cited here asserts that prepubertal children are “generally age 13 or younger” (emphasis added). The members of the APA are presumably fluent in English.
The extraordinary secrecy of the DSM approval process makes it impossible to know who inserted this language and what their intentions may have been. Dr. Franklin, as noted supra, ascribed the clause to Dr. Blanchard, but in this court’s view, there is no evidence that is true. Dr. Blanchard advocated lowering the age limit for prepubescence to 10 if his pedohebe-philia proposal was rejected. Moreover, the same “age 13 years or younger” language appeared in the DSM-4. One explanation for the contradiction which a number of experts have posited is that it was created as a “back door” to allow the hebephilia diagnosis to be included in the DSM-5 after the rejection of the pedohebephilia proposal. The fact that this same language existed in the DSM-4, however, would tend to refute the theory that it was inserted in response to the rejection of the DSM-5 proposal.
Assuming this contradiction was continued in the DSM-5 as a backdoor method of legitimizing the hebephilia diagnosis, this might be seen as an argument the diagnosis is generally accepted (but only if it can be kept a secret). Or, it might support an argument that the diagnosis was so generally abhorred that it was only able to be placed in the DSM through the use of duplicity. This foundational contradiction, in this court’s view, provides no clear answer on the general acceptance question.
The most serious issue is how the contradiction has and will be applied in forensic settings. Absent a hebephilia diagnosis, an expert witness testifying in support of an SVP commitment for an offender with a sexual preference for pubescent children aged 11, 12 or 13, may legitimately argue that such an offender is a pedophile, since the DSM-5 says so. On the other hand, an expert opposing a commitment may argue such an offender is not a pedophile, since he is attracted to pubescent rather than prepubescent children.
There is no way such contradictions can be legitimately resolved in the courtroom. In forensic settings, however, they will have been resolved in some way. The result will be that some offenders with an erotic preference for 11-13-year-old pubescent children will be committed potentially for life as pedophiles while others will be released into the community to *546 potentially prey on children again. The DSM-5 has not helped to resolve that issue. It will facilitate confusion and arbitrary decision-making.
Does Hebephilia Exist and is it “Pathological”
There is no dispute that normal men are sexually aroused to some degree to pubescent children of their gender preference. The evidence also indicated that some men are preferentially aroused to such children, when compared to adults and prepubescent children. There are certainly a range of valid arguments and concerns about the extent of the valid research on this point. There are methodological weaknesses in the PPG studies which have attempted to demonstrate hebephilia. The leading hebephilia study did not demonstrate an erotic preference for pubescent children among homosexual men. It did not include postpubescent teens among its possible erotic targets. The research has been limited and has been primarily conducted by persons affiliated with the CAMH who have been the primary advocates for creation of a defined hebephilia diagnosis. But in the court’s view, the basic point — that some men are preferentially aroused to pubescent children — is adequately supported by a limited amount of existing research.
As Dr. Blanchard has argued, moreover, it is important to separate that question from the issue of whether such arousal is pathological. Reasonable minds can differ on that second point. The question of whether such attraction is “pathological” is not an objective one. It is a value judgment which depends on which sources of authority are deemed most relevant. It is of course true, as hebephilia opponents assert, that historically and even in some cultures today, engaging in sexual relations with pubescent children was acceptable and that pubescent children continue to be sexualized in popular culture. Sexual relations with pubescent girls are evolutionarily adaptive. It is also true, on the other hand, as Dr. Blanchard has pointed out, that the “Darwinism” hypothesis has no force at all when applied to homosexual preferences, and that in our state, having sexual relations as an adult with a child under the age of 13 without the use of forcible compulsion is the crime of rape in the first degree and subject to a determinate prison sentence of up to 25 years. Some states have even harsher criminal penalties for such conduct. Indeed, in our state, such conduct is considered so heinous that it is treated more severely under *547 our criminal and civil laws than attempted murder or an intentional permanently disfiguring assault.[71]
If historical, cross-cultural and cross-species considerations are valid in assessing pathology, it is fallacious, in this court’s view, to assert that the mores of our own society in 2016 can be dismissed as simply a reflection of “criminal” as opposed to deviant or “pathological” behavior. “[T]here is no way in which the concepts of normal and deviant sexual behavior can be divorced from the value systems of our society.”[72] The whole reason the hebephilia debate has arisen is because, in our country today, most would consider an adult man who engaged in sexual intercourse with an 11 or 12 year old (or a pubescent eight year old) to be a deviant sexual predator. Our courts exist to enforce such societal value judgments. Our current mores are at least as relevant to the question of whether such behavior is pathological as those a century ago. It is also significant that the ICD-10 has recognized a sexual preference for early pubertal children as pathological, albeit by defining such preferences as pedophilic rather than hebephilic.
The Practical Difficulty of Diagnosing Hebephilia as a Distinct Disorder
Neither the ICD-10 nor the pedohebephilia proposal sought to define hebephilia as a distinct disorder, as has been proposed here. Both of those authorities rather provide or proposed that an erotic preference for early pubertal (or pubertal children generally) be encompassed in a broader definition of pedophilia or pedohebephilia. The DSM-5 achieves the same result to some extent through its dishonest pedophilic age proxy. Dr. Wilson said he believed there was one disorder, pedohebephilia, with three subtypes, rather than two distinct disorders (pedophilia and hebephilia). The distinct disorder posited here finds no equivalence in any of these authorities.
*548 Defining hebephilia as a distinct disorder, however, would not only be contrary to the DSM proposal or the ICD-10. It is highly problematic from a practical perspective. Hebephilia is a preferential (or equal) arousal to underdeveloped body types. Victim ages are a proxy for such arousal but an obviously problematic one. Distinguishing an erotic preference for prepubertal and pubertal children on the one hand from a non-paraphilic preference for postpubescent teens on the other is difficult. But it would seem even more difficult to accurately distinguish an erotic preference for pubertal teens from both a preference for prepubescent and postpubescent children. Making distinctions between children close to physical maturity and children who are physically mature, as Dr. Thornton testified, is particularly problematic. In this court’s view, such distinctions can simply not be made with the accuracy required by due process in forensic settings given the current state of practice.
Dr. Kunkle testified that of 77 offenders diagnosed with he-bephilia he was aware of only one case in which victim Tanner stage information was available. Dr. Wilson testified that such information is “almost never” available to evaluators. Dr. Calkins said she had never seen such a record concerning a sexual assault victim. Nor, in the vast majority of cases, are detailed data about a victim’s physical characteristics or PPG results used in making the initial diagnoses which result in SVP proceedings. Unless an offender tells an evaluator that he is preferentially attracted to pubescent, rather than prepubescent or postpubescent children, evaluators must largely rely on victim ages for hebephilia diagnoses. But ages are often not accurate proxies, particularly for such fine distinctions. As difficult as such issues are in the abstract, moreover, they are significantly more problematic in practice. The problem is compounded because, not having a defined criterion set under the DSM-5, clinicians are free to assign hebephilia diagnoses in widely disparate ways, many of which are just plainly wrong.
The case law outlined supra provides vivid examples of these problems. Dr. Wilson testified that in a field trial of 39 offenders at the Florida Civil Commitment Center who were diagnosed with a paraphilia NOS involving “adolescent victims” only one third met the criteria for the proposed DSM-5 pedohe-bephilia diagnosis. In other words, as the court understood that testimony, two thirds of these confined offenders did not actually have a legitimate age-related paraphilia. That result, *549 moreover, came from a program where Dr. Wilson served as the clinical director until 2011. Dr. Wilson is one of the world’s foremost authorities on hebephilia.
The instant case reflects the same significant problems. First consider the hebephilia diagnosis which has been offered by Dr. Thomassen, the State’s second expert. As outlined supra, he defined hebephilia as being manifested by a victim preference for children aged 13 or 14 to 16 years old who had secondary sexual characteristics. He thus apparently believes the condition exists for offenders who are preferentially aroused to postpubescent teens. Dr. Thomassen is in good company. The Shannon S. and Appellate Division cases cited supra, validated the same kinds of plainly inaccurate diagnoses. Were this court to find hebephilia was a generally accepted condition, then, it would presumably either have to allow Dr. Thomassen to testify that Mr. P. had a condition called “hebephilia” (which was obviously not hebephilia under any informed definition of that term) or impose a judicially created definition of the diagnosis (which the court would have to create, since it does not exist under the DSM).
Dr. Lord’s diagnosis did not suffer from this obvious flaw. But his conclusions reflected the more widespread diagnostic problems with the diagnosis. As in almost all cases, Dr. Lord apparently did not know the degree of pubertal development or the Tanner stages of Mr. P.’s victims. He relied on an age proxy. But that age was 14 or 15. Even presuming that an 11-14 year old erotic preference might be used as a rough proxy for pubertal development, Mr. P.’s victims were at or beyond that limit when he victimized them. Dr. Lord admitted that even 14-year-old boys are “often post-pubescent.”
Dr. Wilson testified that the fact that 14-year-old children were often postpubescent was one of the significant concerns which preceded the rejection of the pedohebephilia proposal. Descriptive inconsistencies about Mr. P.’s victims also abound in Dr. Lord’s report. As noted supra, he initially assigned Mr. P. with the unique diagnosis of being sexually attracted to “sexually inexperienced young teenage males” a diagnosis he acknowledged was not supported by any research. But he has also described Mr. P.’s paraphilic focus as being to “very young teen-aged boys,” “underage males,” “underage boys” and “young boys.”
The Impact of the Rejection of the Pedohebephilia Diagnosis
Rejecting the pedohebephilia diagnosis may result in fewer SVP commitments. The court also agrees with Dr. Thornton, *550 however, that the degree of “net-widening” which would have arisen from the adoption of the proposal was greatly exaggerated. That rejection will also facilitate the lack of diagnostic clarity which has been so prevalent. It will promote the misdiagnosis of some men with an erotic age preference for pubertal children as pedophiles. The more serious problem is that men who engage in criminal sexual relations with minors but have no age-related paraphilia will likely continue to be assigned hebephilia diagnoses in jurisdictions which allow them, since no criteria for such diagnoses exist under the DSM-5.
VI. The Hebephilia Diagnosis Has Not Been Generally Accepted
This court does not believe the evidence at the hearing demonstrated that the diagnosis “OSPD hebephilia” has been generally accepted in the psychiatric community. It should first be clarified that in this court’s view and for the reasons outlined in Kareem M., the general “OSPD” diagnostic category when accompanied by a valid specifier can result in a valid diagnosis under the Frye standard. Strong arguments have been made by some experts that it is simply never appropriate to use an OSPD diagnosis in a forensic setting, but this court does not accept that view. That view has also been rejected by our Court of Appeals.
As this court outlined in Kareem M., however, OSPD diagnoses (rather than defined DSM-5 criterion sets) generally exist for three reasons. The first is that a disorder is rare. But that is obviously not true for hebephilia. The second is the difficulty of modifying the DSM. But inertia is a feature of most political processes. The fact that hebephilia was rejected does not support the view it is valid. The third reason is that a disorder has been insufficiently researched. Multiple witnesses and articles asserted that point with respect to the pedohebe-philia proposal. That rationale, however, is the reason the Frye standard exists. It exists to prevent scientific methods which have been insufficiently researched and validated from being used in legal proceedings. (See State v Kareem M., 2016 NY Slip Op 50427[U], *24-25.)
In this court’s view, the APA’s rejection of the pedohebephilia diagnosis alone also does not answer the general acceptance question. Dr. Blanchard asserted prior to the proposal’s rejection that were the APA to reject the pedohebephilia diagnosis, *551 that would reflect a verdict that men with a pubescent erotic preference “do not have a psychiatric disorder.”[73] But the court does not agree it is that simple. Nor, in the court’s view, does the DSM-5 paraphilia definition definitely answer the general acceptance question. It is true that a paraphilia under the DSM-5 is defined in part as a sexual preference for “other than” a “physically mature” consenting human partner. But the same organization which approved that language (the APA) also rejected the pedohebephilia proposal. Moreover, the “other than” “physically mature” designation obviously covers the pedophilic disorder criterion set. Drs. Frances and First, the chair and editor of text and criteria for the DSM-4 Task Force, asserted that language in the DSM-4 providing a general paraphilia definition which included sexual arousal to children as a paraphilia was intended to create a “table of contents” for paraphilias with defined criterion sets rather than validate new NOS (now OSPD) diagnoses. That may also be what occurred in the DSM-5 non-diagnostic paraphilia text.
In State v Vanderpool, the court found the hebephilia diagnosis was generally accepted for two reasons. Both rationales the court cited are relevant here. This court however, respectfully, does not find either persuasive. The first was that the sub-work group approved the pedohebephilia diagnosis. The Vanderpool court then equated that approval (without discussion) with the “particular field” through which general acceptance should be measured and the “relevant scientific community.” The evidence at the instant hearing did not support that conclusion.
The relevant scientific community which must be assessed here, as outlined supra, are psychiatrists and psychologists who have as a meaningful part of their practice the evaluation, diagnosis or treatment of sex offenders or perform research in the field (hereinafter the sex offender psychiatric community). The sub-work group was not a valid proxy for that community. The evidence at the hearing indicated the members of the sub-work group were all experts in the field. But the evidence also uniformly indicated they were heavily influenced by the views of Dr. Blanchard and his colleagues and former colleagues at CAMH who dominated the body’s work. Dr. Blanchard and his CAMH colleagues had conducted the most significant research on hebephilia and were largely responsible for the development *552 and advocacy of the pedohebephilia proposal. There is nothing wrong with that. But the evidence at the hearing clearly demonstrated that the sub-work group was not representative of the broader sex offender psychiatric community. It was heavily weighted towards a small group of experts with a point of view on this particular issue.
The proposal was also approved by the work group. But there was no evidence presented at the hearing that the work group was generally representative of the sex offender psychiatric community either. The APA then rejected the proposal. We cannot, of course, know for certain why that occurred. But the most plausible explanation was the one posited by multiple hearing witnesses and articles. The proposal was apparently rejected because it was greeted with a firestorm of criticism by the sex offender psychiatric community, which was communicated to the APA Board. The APA Board then apparently responded to that community. As best as this court can surmise, the APA rejected the pedohebephilia proposal because it was opposed by most of the psychiatrists and psychologists who worked in the field.
The second reason the Vanderpool court held that hebephilia is a generally accepted diagnosis is that “[h]ebephilia was included, albeit under differing terminology, in the ICD X.” This court does not find that rationale persuasive either. First, the differences between the proposals relevant here (the pedo-hebephilia proposal and the instant proposal for a separate he-bephilia diagnosis on the one hand and the ICD-10 on the other) do not simply concern terminology. As Dr. Thornton explained, the ICD-10 includes a subset of what is proposed here as a hebephilia diagnosis, that subset being a sexual preference for children of “early pubertal age” (not all pubertal children) within the definition of pedophilia. The distinct hebe-philia diagnosis which has been proffered here differs from both the ICD-10 and the pedohebephilia proposal. But the more important point is that the ICD-10 is not used as an authoritative diagnostic source in the United States, other than for billing codes. The evidence at the hearing uniformly indicated that it is the DSM-5, not the ICD-10 which is relied upon by the psychiatric community for diagnostic criteria in the United States. General acceptance must be assessed by how members of the relevant psychiatric community in this country view the hebephilia diagnosis, not how psychologists in other countries apply it.
*553 There was significant evidence that most members of the sex offender psychiatric community have opposed the hebephilia diagnosis. As Dr. Franklin testified, 35 scholarly article critiques of the pedohebephilia proposal were made after 2009 with the number of such critiques today being more than 59. The official organization for America’s forensic psychiatrists, the AAPL, conducted a debate on the proposal in 2010. They voted 31-2 against it. A 2010 meeting of the International Association for the Treatment of Sexual Offenders in Oslo, Norway voted 100-1 against the proposal.
Dr. Franklin was one of 123 mental health professional signatories of an open letter opposing the hebephilia diagnoses written to the president of the APA in 2012. As Dr. Calkins testified, persons affiliated with CAMH supported the pedohe-bephilia proposal but the “bulk of the field” challenged the idea that hebephilia was a legitimate diagnosis (Calkins tr at 153). Dr. Calkins described the fact that seven critical letters were sent to the publication the Archives of Sexual Behavior following the initial proposal, which was unusual.
Dr. Franklin conducted a literature review of commentaries or studies on the hebephilia diagnosis. She found that of 116 scholarly articles on the subject 51% were negative, 26% mentioned the issue but did not take a position, 13% were favorable but came from CAMH and 10% were favorable but did not come from CAMH. Comparing the 71 articles which took a position but excluding the CAMH articles, she found that 83% opposed the diagnosis and 17% favored it. The State argues that Dr. Franklin placed a number of these articles into inaccurate categories. Even assuming a number of these articles were not put into correct groups, however, the literature strongly supports the view that hebephilia is not a generally accepted diagnosis. The thrust of the evidence at the hearing was also clear: there was overwhelming opposition to the pedohebephilia proposal in the sex offender psychiatric community. There is overwhelming opposition to the hebephilia diagnosis today.
With respect to the actual use of the hebephilia diagnosis among psychiatrists and psychologists the evidence at the hearing was inconsistent. But a number of facts, in this court’s view, were clear. Evaluators employed by state SVP programs generally use and accept the diagnosis although they do not apply it with anything approaching uniform criteria. Dr. *554 Blanchard and researchers who have been associated with CAMH have supported the diagnosis. But that is where the general acceptance ends. Dr. Calkins estimated that state SVP evaluators represent about .25 of one percent of psychologists or psychiatrists in the United States. While there was evidence some evaluators employed by respondents in SVP cases have accepted and applied the diagnosis, they are apparently in a minority.
Outside SVP proceedings, moreover, there was little evidence the diagnosis is applied at all, even in non-SVP forensic settings. The court did not learn about any sex offender treatment programs focused on hebephilia. It did not learn that outside SVP programs, persons seek treatment for the disorder. As Dr. Calkins testified, unlike other established psychiatric disorders, little is known about the etiology or future course of pubertal erotic preferences.
Dr. Thornton testified that sex offender treatment providers generally recognize that hebephilic sexual interests exist but may not assign a hebephilia diagnosis, since that is not their focus. That makes perfect sense. As Dr. Calkins testified, there is a significant leap between the identification of hebephilic erotic interests and the designation of hebephilia as a mental disorder. That is a leap the psychiatric profession has not made. Hebephilia has never been defined as a mental disorder under the DSM. The diagnosis is relevant outside the research context today only in SVP cases. It exists as a tool to commit (or in New York or Texas supervise) sex offenders under SVP programs. Without any defined criteria, however, it is a tool which in practice has worked very poorly. It is not a generally accepted psychiatric disorder.
The burden to demonstrate general acceptance here is on the State. That burden was not met. As Chief Judge Kaye again cogently framed the issue: “Where controversy rages, a court may conclude that no consensus [on general acceptance under Frye] has been reached.” (People v Wesley, 83 NY2d at 439 [Kaye, Ch. J., concurring].) There are reasonable arguments that the APA should have adopted the pedohebephilia proposal. Perhaps it will at some future time. Research will doubtless continue. The state of knowledge will improve. But the diagnosis of OSPD hebephilia is not today generally accepted in the sex offender psychiatric community. It does not meet the *555 Frye test. It cannot be applied in this case. For all of those reasons, the respondent’s motion to preclude the use of the diagnosis is granted.

. This court recently held that the diagnosis of “Other Specified Para-philic Disorder, arousal to non-consenting persons” did not meet the Frye standard in Matter of State of New York v Kareem M. (51 Misc 3d 1205[A], 2016 NY Slip Op 50427[U] [Sup Ct, NY County, Mar. 29, 2016]). Certain passages of this court’s Kareem M. decision are repeated without page citations here.

. Names with numerical citations refer to the transcript of the hearing testimony.

. Facts regarding the respondent’s criminal history and diagnoses, unless otherwise indicated, are copied or derived from this court’s decision finding probable cause to believe Mr. P. is a sex offender requiring civil management under article 10 issued on October 21, 2014 and Dr. Lord’s report, dated May 12, 2014.

. Dr. Lord’s report at 10.

. Id. at 7.

. Oct. 21, 2014 decision and order at 4.

. Id. at 6.

. Report of Dr. John Thomassen, Sept. 3, 2015 at 12.

. Report of Dr. Leonard A. Bard, Aug. 15, 2015.

. Various DSM editions are often denoted by roman rather than arabic numerals. For consistency, only arabic numerals are used here.

11. The DSM-4 described a “paraphilia” generally as follows: “The essential features of a Paraphilia are recurrent, intense, sexually arousing fantasies, sexual urges, or behaviors generally involving (1) non human objects, (2) the suffering or humiliation of oneself or one’s partner, or (3) children or other non-consenting persons” (DSM-4 at 566).

. Parenthetical references to numbers without a preceding witness name in this section are to pages of the DSM-5.

. Zoophilia is a paraphilia involving a sexual attraction to animals.

. Thornton PowerPoint received in evidence at 5.

. Paul S. Appelbaum, Commentary: DSM-5 and Forensic Psychiatry, 42 J Am Acad Psychiatry L 136, 136 (2014) (the Appelbaum article).

. Jerome C. Wakefield, DSM-5 Proposed Diagnostic Criteria for Sexual Paraphilias: Tensions between Diagnostic Validity and Forensic Utility, 34 Int’l J L & Psychiatry 195, 204 (2011) (the Wakefield article).

. Allen Frances & Michael B. First, 39 J Am Acad Psychiatry L 78, 83 (2011) (hereinafter the Frances article).

. Appelbaum article at 140.

. Ray Blanchard, 42 Arch Sex Behav 675 (2013) (the Blanchard letter).

. Id. at 675 n 3.

. Id. at 676.

. Id.

. Id.

. Ray Blanchard, Sexual Abuse: J of Res & Treatment, A Guest Blog by DSM-5 Paraphilias Subworkgroup Chair Dr. Ray Blanchard on Proposed Criteria for Pedophilic Disorder (Jan. 24, 2012) (the Blanchard blog).

. Id. at 2.

. Id. at 3.

. Id.

28. Dr. Appelbaum’s allusion to the work of a “single research group” was obviously intended to refer to the Center for Addiction and Mental Health in Canada (the CAMH) where Dr. Blanchard worked.

. Appelbaum article at 138.

. Id. at 139.

. Thornton PowerPoint received in evidence at 10.

. Ray Blanchard et al., 41 Arch Sex Behav 13 (2012).

. A “Kappa coefficient” or “Cohen’s kappa” is described by Wikipedia as “a statistic which measures inter-rater agreement for qualitative (categorical) items. It is generally thought to be a more robust measure than simple percent agreement calculation, since [it] takes into account the agreement occurring by chance.”

. Obviously, this sentence is not grammatically correct and may reflect a typographical error but its meaning is clear enough.

. Ray Blanchard et al., 38 Arch Sex Behav 335 (2008).

. Id., article abstract.

. Klaus M. Beier et al., Hebephilia as a Sexual Disorder, 81 Fortschr Neurol Psychiatr 128 (2013).

. Kurt Freund et al., 122 Brit J Psychiatry 163 (1973).

. Paul H. Gebhard et al., Sex Offenders: An Analysis of Types 83-85, 102-105 (1st ed 1965).

. Karen Franklin, Hebephilia: Quintessence of Diagnostic Pretextuality, 28 Behav Sci & L 751 (2010).

. Dennis M. Doren, 80-81 (1st ed 2002).

. Open letter from Mental Health Professionals, Sex Educators, and Researchers Urging the APA to Exclude Unreliable Paraphilic Proposals from the DSM-5, May 31, 2012.

. See n 16, supra.

. Wakefield article at 205.

. See n 17, supra.

. Frances article at 80.

. Id. at 81.

. Id. at 83.

. Id. at 84.

. Id.

. 39 J Am Acad Psychiatry L 506 (2011) (hereinafter the Prentky article).

. Id. at 507.

. Hebephilia: A Postmorten Dissection, 44 Arch Sex Behav 1109 (2015).

. Id. at 1113.

. Id. at 1115.

. Id. at 1116.

. Id. (citation omitted).

. Id.

. Multiple articles and a book chapter regarding the use of PPG tests for hebephilia were received in evidence but their citations are not provided here.

. Bruce Rind & Richard Yuill, Hebephilia as a Mental Disorder? A Historical, Cross-Cultural, Sociological, Cross-Species, Non-Clinical Empirical, and Evolutionary Review, 41 Arch Sex Behav 797 (2011).

. The respondent was also diagnosed with antisocial personality disorder (ASPD) and alcohol abuse, but the Court’s decision focused on the sufficiency of the hebephilia diagnosis.

. See State v Kareem M., 2016 NY Slip Op 50427(U), *20 n 25 (outlining 16 individual Frye hearings which had been or were in the process of being conducted on the date of the decision, Mar. 29, 2016).

63. Citing to People v Wesley, 83 NY2d 417 (1994).

. Frances article at 84.

. See n 57, supra.

. See n 29, supra.

. See n 58, supra.

. See n 19, supra.

. See n 30, supra.

. Blanchard blog, supra at 2.

. While rape in the first degree, assault in the first degree and attempted murder in the second degree are all class B violent felonies with the same determinate sentencing ranges, first degree rape offenders are subject to significantly longer potential periods of postrelease supervision, must register as sex offenders for life and are eligible for sex offender civil management. (See Penal Law § 70.45 [postrelease supervision periods]; Correction Law § 168-h [providing for mandatory lifetime registration for a “sexually violent offender” defined, in part, as an offender convicted of rape in the first degree]; Mental Hygiene Law art 10 [providing that a single conviction for such a crime makes an offender eligible for indefinite civil management].)

. Prentky article at 509, quoting Judd Marmon, “Normal” and “Deviant” Sexual Behavior, 217 J Am Med Assn 165, 169 (1971).

. See n 27, supra.